588 N.E.2d 1023 (1991)
147 Ill.2d 270
167 Ill.Dec. 893
The PEOPLE of the State of Illinois ex rel. Roland BURRIS et al., Plaintiffs,
v.
George H. RYAN et al., Defendants.
Docket No. 72662.
Supreme Court of Illinois.
December 13, 1991.
*1024 Roland W. Burris, Atty. Gen., Springfield (Thomas R. Dodegge, James R. Carroll, Roger P. Flahaven and Michael Daniels, Asst. Attys. Gen., Chicago, of counsel), for plaintiffs.
William J. Harte, Robert L. Tucker, Joseph E. Tighe, Stephen L. Garcia, Courtney C. Nottage, Herman G. Bodewes and James H. Donnewald, Chicago, for intervenor-plaintiffs Joseph Gardner et al.
Gary A. Weintraub, David A. Epstein and Les S. Kuczynski, Chicago, for intervenor-plaintiffs Thaddeus S. Lechowicz et al.
Schaefer, Rosewein & Fleming, Chicago (Martha A. Mills, of counsel), for intervenor-plaintiffs Rebecca W. Owens et al.
*1025 Kevin M. Forde and Janice R. Forde, Kevin M. Forde, Ltd., and James M. Scanlon, Chicago, for intervenor-plaintiffs Beverly Area Planning Association et al.
Matthew J. Piers, Jonathan A. Rothstein and Carol L. Nealy, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, for intervenor-plaintiff Miguel del Valle.
William H. Mansker, Mansker & Shanahan, James D. Montgomery and Jean M. Templeton, of James D. Montgomery & Associates, Ltd., and Robert Anderson, Chicago, for intervenor-plaintiffs Task Force for Black Political Empowerment et al.
Jefferey D. Colman, Thomas S. O'Neill and Janice A. Horanday, Jenner & Block, and Linda Yanez and Arturo Jauregui, Chicago, for intervenor-plaintiffs Henry Martinez et al.
Dan K. Webb, Steven F. Molo, Timothy J. Rooney and Thomas V. Skinner, Winston & Strawn, Chicago, Special State Counsel for defendants George H. Ryan, Illinois Secretary of State, and the Illinois Legislative Restricting Commission.
A.L. Zimmer and V. James Tenuto, Chicago, Special State Counsel for defendant Illinois State Board of Elections.
Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., Chicago (Marvin Gittler and Joel A. D'Alba, of counsel), for amicus curiae Illinois State Federation of Labor.
Tyrone C. Fahner, Richard S. Williamson, George J. Tzanetopoulos and Lori E. Lightfoot, of Mayer, Brown and Platt, and Charles F. Marino and David M. Marino, Chicago, for amici curiae Congressmen Dennis J. Hastert et al.
Justice CUNNINGHAM delivered the opinion of the court:
The plaintiffs, the People of the State of Illinois ex rel. Burris et al., appeal the adoption of the statewide plan of redistricting approved by the Illinois Redistricting Commission (Commission), which was filed with the Secretary of State on October 4, 1991. This court has original and exclusive jurisdiction over this matter pursuant to article IV, section 3, of the Illinois Constitution of 1970.
The facts are as follows. Pursuant to article IV, section 3(b), of the Illinois Constitution of 1970, the Illinois General Assembly was required to redistrict the legislative and representative districts throughout the State because of the Federal decennial census. The new districts must be compact, contiguous and substantially equal in population, as required in article IV, section 3(b), of the Illinois Constitution of 1970.
On June 30, 1991, both houses of the Illinois General Assembly passed a redistricting plan, House Bill 1354, as amended. Governor Jim Edgar vetoed amended House Bill 1354. As a result of the veto, article IV, section 3, of the Illinois Constitution of 1970 provided for the formulation of the Illinois Legislative Redistricting Commission. The Commission was to develop and approve a redistricting plan by August 10, 1991.
The Commission was formed on July 10, 1991. The first meeting of the Commission was scheduled for and occurred on July 17, 1991. At the first meeting, the Commission elected its chairman and vice-chairman as well as adopted its rules of procedure. The Commission also unanimously consented to receive and incorporate the legislative record relating to the redistricting, House Bill 1354, as amended, into its record.
On July 29, 1991, the Commission conducted two hearings, one in Chicago and the other in Springfield. At each hearing, four commissioners were in attendance at each site, two commissioners affiliated with the Democratic party and two commissioners affiliated with the Republican party. At both hearing sites, the Commission heard public testimony.
At the next meeting, on August 8, 1991, the full Commission met in Springfield and heard public testimony. At the next meeting, on August 10, 1991, in Springfield, certain commissioners formally presented to the Commission the redistricting plan of House Bill 1354, as amended (Plan I). However, Plan I failed to receive the affirmative vote of the Commission. At the conclusion of the August 10 meeting, the *1026 Commission failed to file a plan approved by five members.
Because the Commission failed to approve a redistricting plan, article IV, section 3(b), directed that this court submit the names of two persons, not of the same political party, to the Secretary of State no later than September 1. This court submitted the names of Albert R. Jourdan, chairman of the Republican party of Illinois, and Daniel P. Ward, retired Justice of the Supreme Court of Illinois, only one of whom was to be selected.
At the next meeting of the Commission, September 5, 1991, the Secretary of State drew the name of the ninth member of the Commission, Albert R. Jourdan. Following the September 5 meeting, the chairman requested a meeting to be held on September 23, 1991. However, at that requested meeting, only a total of four commissioners were in attendance.
At that time, the chairman recognized the lack of a quorum. The meeting was then set to reconvene September 25, 1991. Defendant Secretary of State states that at the request of the chairman, no meeting notice for the September 25 meeting was issued in compliance with rules, no meeting was scheduled in compliance with the rules, and no meeting was held in compliance with the rules. Therefore, the transcript of the September 23 meeting is not an official Commission document.
The nine-member Commission met for the first time on September 25, 1991. It was at this meeting that the Commission amended the rules to allow for the election of a new chairman. The ninth member, Albert R. Jourdan, was elected as the new chairman. The former chairman was elected as vice-chairman. After the election, the Commission heard public testimony regarding the redistricting process. The Commission also heard testimony regarding certain Commission members' holding extra-Commission meetings with individuals and groups. The testimony concerned the makeup of each district, especially the percentages to be used for racial or ethnic makeup of certain districts.
The new chairman stated, in part:
"It is the desire of the Chairman to accept proposed maps for publication on Tuesday, October 1, 1991. These will be shared with the press and public immediately upon filing. The Commission will then accept written comments on all proposed maps until 12:00 noon on Thursday, October 3, 1991 * * *. It is my intention to call another meeting for 9:00 a.m. on Friday, October 4, 1991, in the State Capitol in Springfield. At that time, further oral comments on published maps will be received in the same manner we are receiving comments today."
At the next meeting, on October 1, 1991, chairman Jourdan submitted a statewide redistricting plan called "The Jourdan Plan" (Jourdan I Plan). The chairman announced that written comments could be filed regarding Plan I and the Jourdan I Plan by noon October 3, 1991. After testimony of only one witness, the Commission adjourned until Friday, October 4, 1991.
Although the rules adopted July 17, 1991, provided that all redistricting plans were to be accompanied by a computer diskette in the ASCII format encoded in a 13-character designation code, the Jourdan I Plan was not in compliance with the rules. As such, the Jourdan I Plan was not submitted to the Democratic members of the Commission for proper and expeditious analysis.
On October 3, 1991, the Democratic appointees to the Commission submitted an amendment to Plan I, the "Cousin Plan." Also on October 3, 1991, numerous written comments from the public were submitted in response to the Jourdan I Plan. The Commission still had an additional day in which to consider public testimony, proposed amendments or revisions to the plans, and to deliberate collectively on the merits of the redistricting plans. An amendment to the Jourdan I Plan, the Jourdan II Plan, was submitted on the morning of October 4, 1991.
At the final meeting, October 4, 1991, the Commission heard public testimony from 36 individuals on their own behalf or on *1027 behalf of certain groups against the implementation of the Jourdan I Plan.
However, at the final meeting, the clerk of the Commission announced that an amendment to the Jourdan I Plan had been submitted to the Commission by the chairman that very morning. A Democratic commissioner pointed out that no Democratic member had seen it or received a copy of the computer diskette. The chairman announced that it was not required by the rules, but that the diskette would be available. At that point, the chairman moved for public testimony.
The witnesses gave testimony regarding the Jourdan I Plan. At the end of the public testimony and a short adjournment, commissioner Cousin moved for leave to amend Plan I with the Cousin amendment, but by a 5-4 vote, the Commission denied the motion. After the defeat of the Cousin amendment, a Republican commissioner then moved for leave to amend the Jourdan I Plan and for consideration of the amended plan (Jourdan II Plan). The chairman refused three times to permit questions regarding the Jourdan II Plan. Again, a Democratic commissioner stated that he did not know what the amendment to the Jourdan I Plan accomplished. After the chairman called for a roll call, the Commission adopted the amendment by a 5-4 vote.
Thereafter, commissioner Churchill moved to approve the Jourdan II Plan. The Democratic commissioners made inquiries regarding what the Jourdan II Plan accomplished. The answer by the Republican commissioners to the question was that the "map in that part of the state complies with both the Illinois and Federal Constitutions and is politically fair and meets the requirements of the Federal Voting Rights Act."
Eventually, a motion was made to adopt the Jourdan II Plan. It was adopted by a 5-4 vote. The Jourdan II Plan was filed with the Secretary of State on October 4, 1991. Following the adoption of the Jourdan II map, the Commission, by resolution, directed the State Board of Elections to commence the preparation of legal descriptions of the representative and legislative districts. The Commission, also by resolution, authorized the firm of Winston & Strawn to file an action seeking "a declaratory judgment that the approved redistricting plan is in compliance with applicable State and Federal laws." The Commission then adjourned.
Subsequently, on October 11, 1991, the Attorney General of Illinois, Roland W. Burris (plaintiff), filed a motion with this court, pursuant to Supreme Court Rule 382 (134 Ill.2d R. 382), seeking leave to file a complaint challenging the Jourdan II Plan.
This court granted the motion of the plaintiff and motion of Gardner and Martinez to intervene. On November 6, 1991, this court granted several additional parties leave to intervene, i.e., Owens, Lechowicz, the Beverly Area Planning Association, del Valle, and the Task Force for Black Political Empowerment.
Defendant Secretary of State answered each complaint and filed a motion to dismiss each complaint for failure to join the Commission as a necessary party and for failure to state a cause of action.
In section 3 of article IV of the Illinois Constitution, it is provided that the legislative and representative "[d]istricts shall be compact, contiguous, and substantially equal in population." (Ill. Const. 1970, art. IV, § 3(a).) In defining those requirements, this court over the years has emphasized that a redistricting plan must not dilute minority voting strength, must not accomplish political gerrymandering and must keep communities of interest.
Although this court will look for guidance and inspiration from the Federal court in interpreting our State constitution, we make the final determination. (Rollins v. Ellwood (1990), 141 Ill.2d 244, 275, 152 Ill.Dec. 384, 565 N.E.2d 1302.) In line with that holding, we do not adopt the recent opinion of the Federal court in Hastert v. State Board of Elections (N.D.Ill.1991), 777 F.Supp. 634. We first note that the Hastert court did not have before it any plan approved by the constitutionally mandated Commission and, as such, its findings have no bearing on this cause. Second, the *1028 issue before the Hastert court was to "determin[e] which of the two proposed plans best meets the goals and criteria, both constitutional and non-constitutional, enumerated by the [United States] Supreme Court." (Hastert, 777 F.Supp. at 640.) Neither plan was generated or approved by the Commission. It is the detailed analysis of the constitutional requirement for approval of a redistricting plan which we find of significance.
The Hastert court did reiterate an important consideration of all parties:
"`The very essence of districting is to produce a differenta "more politically fair"result. * * * Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of the districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. * * * Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.'" (Hastert, 777 F.Supp. at 659, quoting Gaffney v. Cummings (1973), 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298, 312.)
This court also recognizes that historically municipalities, villages, townships, cities and counties may have to be divided in order to achieve the Illinois constitutional requirements, but more importantly to meet the controlling consideration of "one man-one vote." People ex rel. Scott v. Grivetti (1971), 50 Ill.2d 156, 167, 277 N.E.2d 881.
The initial concern is drawing a district map which is compact. This court has stated, "[C]ompactness, while an end to be sought in the redistricting process, is clearly subservient to the dominant requirement of equality of population among legislative districts." (Grivetti, 50 Ill.2d at 166, 277 N.E.2d 881.) Statistics do not necessarily reveal compactness. (Schrage v. State Board of Elections (1981), 88 Ill.2d 87, 98, 58 Ill.Dec. 451, 430 N.E.2d 483.) On the other hand, boundary lines of villages, townships, counties and cities do not necessarily reveal communities of interests. Unlike the Ohio Constitution, which believes such lines do, our legislature has recognized the difficulty in drawing district lines by following established boundary lines. (See Armour v. Ohio (6th Cir.1991), 925 F.2d 987; People ex rel. Woodyatt v. Thompson (1895), 155 Ill. 451, 461, 477, 40 N.E. 307.) The consensus of this court is that the districts must be reasonably compact and not necessarily perfect. Grivetti, 50 Ill.2d at 166, 277 N.E.2d 881; Thompson, 155 Ill. at 478, 40 N.E. 307; Schrage, 88 Ill.2d at 95, 58 Ill.Dec. 451, 430 N.E.2d 483.
In Thompson, the court defined compact as "closely united." (Thompson, 155 Ill. at 478, 40 N.E. 307.) "In fact, compactness is `almost universally recognized' as an appropriate anti-gerrymandering standard." (Schrage, 88 Ill.2d at 96, 58 Ill.Dec. 451, 430 N.E.2d 483; Thompson, 155 Ill. at 479, 40 N.E. 307.) In sum, compactness is a constitutional requirement in Illinois which cannot be ignored in redistricting. Schrage, 88 Ill.2d at 96, 58 Ill.Dec. 451, 430 N.E.2d 483.
Contiguousness was defined by this court in Western National Bank v. Village of Kildeer (1960), 19 Ill.2d 342, 352, 167 N.E.2d 169, as follows:
"`Contiguity' means `in actual contact; touching or adjoining.' * * * [I]n order to be considered contiguous within the meaning of the statute, the tracts of land in the territory must touch or adjoin one another in a reasonably substantial physical sense. However, the line of demarcation between the reasonableness and unreasonableness of the contiguity cannot be drawn with precision and must be *1029 determined from the facts of each case when viewed in the light of such concept."
In Schrage, this court thoroughly examined the requirement of substantially equal and stated:
"The Illinois Constitution of 1970 requires that all legislative districts be `substantially equal in population.' (Ill. Const. 1970, art. IV, § 3(a).) An interpretation of the `substantially equal in population' standard is contained in the 1970 constitutional convention legislative committee's explanation on the proposed standards for redistricting. The committee stated:
`Recognizing that equality of population is the primary criterion for redistricting, the Legislative Committee decided to place the flexible phrase, "substantially equal in population" in the sub-section on standards. The degree of flexibility of this phrase will clearly be determined by the courts. The Legislative Committee believes it is important to recognize the "equality of population" criterion in a way which will allow redistricting in Illinois to accord with the prevailing Supreme Court decisions on this subject. Should the Supreme Court ever relax the "one man, one vote" standard, Illinois would not be precluded from creating districts within more flexible population limitations imposed by the courts.' [Citation.]
* * * It is thus clear that the requirement that legislative districts be `substantially equal in population' is coextensive with the Federal requirement of `one man, one vote' and that this constitutional standard is flexible and is to be interpreted in accordance with the prevailing United States Supreme Court decisions." Schrage, 88 Ill.2d at 100-01, 58 Ill.Dec. 451, 430 N.E.2d 483.
Upon review, the duty of this court is to determine whether the principle of compactness of territory has been applied. (Thompson, 155 Ill. at 480, 40 N.E. 307.) In addition, section 3(b) of article IV of the Illinois Constitution provides that "[a]n approved redistricting plan filed with the Secretary of State shall be presumed valid, [and] shall have the force and effect of law." (Ill. Const. 1970, art. IV, § 3(b).) "[W]here there is any reasonable doubt as to whether a statute is constitutional or not, the courts will incline in favor of the law, and hold it valid." (Thompson, 155 Ill. at 464, 40 N.E. 307.) However, this court held in Grivetti that any process which is "so completely at variance with the constitutional mandate" precludes this court from "recognizing as valid a product formulated by [such] means." (Grivetti, 50 Ill.2d at 165, 277 N.E.2d 881.) Although this court made that conclusion in Grivetti regarding the provision regarding the self-appointment of legislative leaders to the redistricting Commission, we find it applicable in this cause.
In this case, the parties have presented insufficient facts for this court to ascertain with certainty whether the district lines meet legal guidelines. Accordingly, we must remand the matter to the Commission for further proceedings.
It is well established that this court is a court of review which has jurisdiction over issues of law. We will not assume jurisdiction of an original action if the pleadings present issues of fact. (Monroe v. Collins (1946), 393 Ill. 553, 557, 66 N.E.2d 670; People ex rel. Jones v. Robinson (1951), 409 Ill. 553, 555, 101 N.E.2d 100.) Unlike the Hastert court, this court does not have data with which to review because the Commission did not hold a hearing on the approved map. The Hastert court had census data, deviation statistics, and expert testimony. This court has only allegations and affidavits.
Furthermore, both sides have been granted over a million dollars to submit a plan, or plans, or amendment to a plan, as well as the opportunity to provide for public scrutiny and hearing. Since both sides submitted plans and amendments on the last two days, thereby thwarting any type of hearing, whether for expert testimony or public criticism, we cannot in good conscience approve or disapprove any plan no matter how fair, compact or contiguous *1030 and substantially equal the districts have been formed. This court finds that to do otherwise would circumvent the spirit and purpose of the Illinois Constitution.
Even though this court does not reach the issue regarding the constitutional validity of the plan as a whole, we do find certain districts do not appear to meet the constitutionally mandated requirements. (Schrage, 88 Ill.2d at 98, 58 Ill.Dec. 451, 430 N.E.2d 483.) We have enumerated these districts with the questions to be addressed at the hearing:
1. Compactness:
Do the following districts violate article IV of the Illinois Constitution of 1970, which provides that all districts be drawn in a compact and contiguous manner? Is there a justifiable, neutral reason for any of the below configurations?

Senatorial District House District
 7 14
 10 19
 11 21
 18
 24 47
 34
 37 73
 38 75
 53
 54

2. Compactness and Racial Dilution:
Do the following districts violate article IV, section 3, of the Illinois Constitution of 1970, which provides that all districts be drawn in a compact and contiguous manner? Do the following districts violate article III, section 3, of the Illinois Constitution of 1970, which provides that all elections be free and equal? Is there a justifiable, neutral reason for any of the below configurations?

Senatorial District
 6
 36
 44
 51
 52
 56
 57

3. Racial Dilution:
Do the following districts violate article III, section 3, of the Illinois Constitution, which provides that all elections be free and equal?

Senatorial District House District
 21 5 and 6
 29 8
 33 10
 39 25 and 26
 42 27 and 28
 43 32
 50 59
 61 and 62

The Commission is not precluded or limited to considering other Senatorial or House districts in addition to those listed above.
This court finds that the well-researched Hastert opinion should be seriously reviewed by the Commission and each party as they submit a plan, data and testimony. These guidelines will be followed by this court as it reviews any plan or plans approved and submitted by the Commission to this court. If the Commission follows these guidelines, we will then have the necessary evidence with which to adequately review and issue a final decision in this matter.
We remand this cause to the Commission with the following directions. The Gardner intervenors, the Attorney General and other intervenors jointly, and the five commissioners of the Legislative Redistricting Commission who supported the Jourdan II Plan, and the other defendants jointly, are each given leave to file within seven days from December 20, 1991, a modified statewide plan of reapportionment considering the districts listed above, and making any changes thereby required or incidental thereto. Each plan submitted shall be accompanied by:
(a) a map;
(b) census geography description;
(c) statistical summaries of minority population and voting age population;
(d) exchangeable computer diskette for the court and all parties.
These documents shall be filed with the clerk of the supreme court and the members of the court.
Each side shall have seven days from the date of December 27, 1991, to file written objections to the other side's plan. After each side has filed its written objections, *1031 the Commission shall forthwith hold an expedited hearing. On the completion of the expedited hearing, the Commission shall submit an adopted plan, in addition to any other plan considered by the Commission during the hearing. These plans and data must be in the manner prescribed by the Commission rules.
Defendant State Board of Elections shall submit a schedule that shall provide dates for filing nomination petitions for the Senate and House.
It is imperative that a redistricting plan be approved; however, if a plan is not approved on or before January 6, 1992, the only alternative at that point in time will be for this court to declare an at-large election for the Illinois Senate and House, leaving the redistricting map for another day. This court also emphasizes that these directions do not in any way suggest that the adopted plan or plans submitted to this court will be automatically approved by this court.
This court retains jurisdiction over all motions still pending until this court has reached a final decision in this matter. This court shall retain jurisdiction of this cause until the Commission submits an approved map in line with this opinion and guidelines offered in Hastert. See Schrage, 88 Ill.2d at 105, 58 Ill.Dec. 451, 430 N.E.2d 483.
Remanded to Commission, with directions.
Chief Justice MILLER, dissenting:
Unlike the majority, I would consider now, without any further delay, the merits of the Commission's redistricting plan. Today's decision unnecessarily postpones our resolution of the important issues presented by this case, jeopardizing the timely adoption of a constitutional mapone that accurately reflects the substantial shifts in population that have occurred in Illinois since the last decennial census.
Before this court, the plaintiffs raise a number of important issues concerning the redistricting plan adopted by the Commission. The plaintiffs argue, as a preliminary matter, that the procedures leading up to the adoption of the plan were fatally flawed. In addition, the plaintiffs challenge the Commission plan on a variety of substantive constitutional and statutory grounds. In this regard, the plaintiffs contend that certain specified districts in the plan violate the rights of women, violate the rights of minorities, are the result of political gerrymandering, and are insufficiently compact. The majority opinion resolves only peripheral questionsand those incorrectlyand fails entirely to provide the parties with any decision, or meaningful guidance, on the substantive issues before the court. Although the majority invites the parties to submit additional redistricting plans, the majority neglects to explain what criteria will eventually control our acceptance or rejection of those maps, which later may very well be challenged on the same grounds raised here.
The majority concludes that the present record does not afford us a sufficient evidentiary basis on which to resolve the plaintiffs' various challenges. The majority believes that the defects it finds in the record may be attributed to the Commission's failure to conduct any fact-finding hearings on the Jourdan II Plan, which the Commission ultimately adopted. The majority further declares that, in the absence of a hearing, this court can neither approve nor disapprove the adopted plan, no matter how fair, compact, or contiguous its districts might be. There is, however, no requirement that the Commission hold such hearings on the proposals before it; even if such a requirement existed, I could not agree with the majority's suggestion that the Commission's failure to conduct a public hearing on the plan would necessitate our rejection of it.
There is no requirement, constitutional or otherwise, that fact-finding hearings be conducted by the Commission. Neither the constitutional drafters nor the persons present at this Commission's creation believed that fact-finding hearings would be necessary for the complete performance by the Commissioners of their duties. The detailed provisions contained in section 3 of *1032 the legislative article, which govern the operations of the Commission, contain no requirement that the Commission hold hearings on the redistricting proposals before it. (See Ill. Const. 1970, art. IV, § 3.) Moreover, the Commission's own rules, which the eight original members adopted unanimously, do not require the holding of fact-finding hearings on redistricting proposals. Although the Commission's failure to hold a public hearing on the plan it adopted might conceivably cause us to scrutinize more closely that plan and the data offered in support of it, the absence of such public input should not automatically render the plan invalid, regardless of its merits. See Karcher v. Daggett (1983), 462 U.S. 725, 759, 103 S.Ct. 2653, 2674, 77 L.Ed.2d 133, 160 (Stevens, J., concurring).
In any event, the record of the Commission's proceedings is far from barren. The Jourdan II Plan represented the culmination of the redistricting process; it was produced following the presentation of the Jourdan I Plan and the receipt of commentary on that earlier proposal. Thus, it is difficult to understand the majority's apparent pique with the parties' submission of their final proposals near the end of the Commission proceedings. The Commission had before it a broad range of information that it could use in developing a redistricting map. Numerous persons testified at the Commission's public hearings. These witnesses, who came from urban and rural areas throughout the State, not only commented on the relative merits and demerits of other specific redistricting proposals, but also provided general testimony on the needs and interests of the communities they represented. Other persons, too, representing a broad range of views, were consulted by the principal drafters of the Jourdan II Plan. Apart from these sources of information, the Commission also had available to it the extensive record made by the legislature itself during its own consideration of the matter, including the data and testimony compiled during that stage of the process. As demonstrated by the affidavits submitted by the parties, all this testimony, census data, and other information were considered in the formulation of the Commission's plan. And all of this information is included in the record before us.
Determining nonetheless that the present record requires supplementation, the majority remands the matter to the Commission for further proceedings and invites the parties to submit additional maps. Also, the majority opinion summarily concludes, without analysis, that certain districts contained in the Jourdan II Plan appear to violate constitutional requirements concerning compactness and racial dilution, and the majority directs the Commission to consider these objections further.
As I have noted, however, the majority's decision resolves none of the substantive issues now before us, and the parties are left without any meaningful guidance on the substantive legal principles that frame the plaintiff's challenges. Thus, it is simply not clear why the majority believes that certain districts are not compact while others are. Nor is it clear why other districts both lack compactness and implicate concerns of racial dilution, or why still other districts implicate only concerns of racial dilution.
The majority opinion does not explain the grounds for its apparent rejection of these districts, and the opinion fails entirely to resolve the different legal issues raised by the parties in connection with these specific challenges. And in directing the Commission to consider these objections to particular districts in the new proceeding, the court inexplicably includes in its lists certain districts that are not challenged at all, by any party. If the majority is in fact concerned about districts that until now have gone unchallenged, or that should be challenged on grounds different from those raised by the parties, then the majority should at least make that clear. In any case, I do not see what can be gained from the majority's request to the Commission that it resolve the constitutional questions that should be answered by this court.
Contrary to the majority's view, I believe that the plaintiffs' substantive and procedural challenges to the Commission's plan *1033 may be determined at this time, on the basis of the information now before this court. The parties have submitted extensive briefs and supporting documentation on these various issues. Indeed, the record before us appears to be as complete as the one presented to the three-judge panel in Hastert v. State Board of Elections (N.D.Ill.1991), 777 F.Supp. 634, which the majority initially refuses to adopt but then later endorses as a model. If in fact the record in this case is incomplete and we lack certain data or other information necessary for the resolution of these questions, as the majority suggests, but that I do not believe, then we should enter an appropriate order and direct the parties to supply the absent evidence on an expedited basis.
By remanding the present matter to the Commission without analyzing any of the substantive or procedural issues raised by the parties, the court is postponing, if not abdicating, the performance of its constitutionally mandated duty to determine the validity of the redistricting plan adopted by the Commission. In addition, the majority's decision severely limits the possibility that the parties might reach a compromise and settle on a valid map that is acceptable to all. Determining the merits of the plaintiffs' underlying claims, and not just the specific challenges to certain districts, would at least enable the parties to proceed in their mapmaking with some guidance on the applicable principles of law. Little can be gained through the majority's procedure, except to put off to another day this court's resolution of the issues presented here, a determination the majority has intimated it might escape by calling for an at-large election if no satisfactory plan is proposed. Although the parties have not addressed the prospect of an at-large election, that procedure itself might implicate the Federal Voting Rights Act, which influenced the drawing of many of the districts complained of here.
We have before us a full and complete record on which to decide the present matter. Rather than delay further the resolution of this controversy, I would consider now the various substantive and procedural issues raised by the plaintiffs in their challenges to the Commission's redistricting plan. For these reasons, I respectfully dissent.
MORAN, J., joins in this dissent.