(No. 72662 ▮▮▮▮▮▮▮▮)

THE PEOPLE *ex rel.* ROLAND BURRIS, Attorney General, *et al.* (Monroe Flinn, Petitioner), v. GEORGE H. RYAN, Secretary of State, *et al.*, Respondents.

*Order entered February 3, 1994.—Motion for reconsideration denied March 15, 1994.*

CHIEF JUSTICE BILANDIC, dissenting from denial of the petition for post-judgment relief:

I join in the dissent of Justice Harrison, and add further: I have full faith and confidence in the integrity of my former colleague, although we disagreed on the ultimate outcome of this case in 1992.

Nevertheless, I also believe that Representative Flinn has adequately alleged facts in his petition to warrant a hearing. We should abide by the words inscribed in our courtroom, "*Audi Alteram Partem.*" As stated in my dissent to Justice Cunningham's majority opinion:

"I believe that the tie-breaking procedure set forth in article IV, section 3(b), of the Illinois Constitution of 1970 violates the due process clause of the fourteenth amendment to the United States Constitution. Any redistricting plan produced as a result of the tie-breaking procedure is therefore unconstitutional and invalid." *People ex rel. Burris v. Ryan* (1992), 147 Ill. 2d 270, 314.

The well-pleaded petition provides this court with

the opportunity to consider and correct the serious constitutional infirmity of our redistricting procedure.

JUSTICE HARRISON, also dissenting from denial of the petition for post-judgment relief:

In this petition for post-judgment relief, Monroe Flinn, a Representative from District 113, has presented facts which directly challenge the legitimacy of the decision by which this court approved the current map of legislative districts. Because of the overriding importance of the redistricting decision to the voters of this State, the gravity of the accusations levelled by Rep. Flinn, and the need for this court to avoid even the appearance of impropriety in exercising its constitutional authority, I believe that we are obligated, at a minimum, to afford Rep. Flinn a hearing on his petition. I therefore dissent.

The dispute over the legislative map first came before this court pursuant to its "original and exclusive jurisdiction over actions concerning redistricting the House and Senate ***." (Ill. Const. 1970, art. IV, § 3(b).) After rejecting the redistricting plan initially presented (*People ex rel. Burris v. Ryan* (1991), 147 Ill. 2d 270) (*Ryan I*), the court considered two alternatives, the Certain Intervenors' Proposed Remedial Redistricting Plan (CIP II-A) and the Illinois Redistricting Commission's plan (Jourdan III-A). There is no dispute that Jourdan III-A was the map more favorable to the Republican Party.

The three members elected to this court as Democrats found that neither map satisfied constitutional standards and voted to reject both. On the other hand, the three members elected as Republicans all voted to approve the Jourdan III-A (Republican) map. The deciding vote was cast by Justice Joseph Cunningham, former Director of the Administrative Office of the Illinois Courts, who was appointed to this court to fill

the vacancy created by the death of Justice Horace Calvo. Justice Cunningham cast his vote for the Republican map, and, in an opinion which Cunningham authored, the map was approved. *People ex rel. Burris v. Ryan* (1992), 147 Ill. 2d 270 (*Ryan II*).

Justice Cunningham began his judicial career as a justice of the peace in St. Clair County and advanced to the post of chief circuit judge before being appointed to this court. Because all of this was accomplished under the auspices of the Democratic Party, Cunningham's decision to back the Republican map, notwithstanding its constitutional infirmities, struck some as more than a little unusual. Proponents of the Republican map no doubt convinced themselves that Cunningham's judgment was simply the triumph of clear thinking over personal politics. As it turns out, just the opposite may have been true.

In the petition for post-judgment relief now before us, Rep. Flinn has produced the transcript of a recent deposition given by Justice Cunningham in a libel case wholly unrelated to this dispute. In that deposition, Cunningham testified that while the redistricting litigation was underway, he attended a dinner party at the MAC, an exclusive men's club in St. Louis, Missouri, along with a number of Democratic and Republican circuit judges, a Republican appellate judge and their wives. At that party, he announced his intention to run for election to the supreme court in 1992. Such a declaration would not have been noteworthy except that Cunningham revealed that he would run not as a Democrat, but as a Republican. Although Cunningham had previously made public statements that he had reservations about the job because of its 10-year term, he admitted that he still had some interest in the position and was considering running as a Republican because "I think, if anything, I may have been ticked off at the Democratic

party for not asking me if I wanted to run, to give me the option to say no."

While the drawing of redistricting maps is an inherently political process (see *Gaffney v. Cummings* (1973), 412 U.S. 735, 753, 37 L. Ed. 2d 298, 312, 93 S. Ct. 2321, 2331), judicial review of such maps must turn on legal, not political, considerations (see *Ryan II*, 147 Ill. 2d at 302 (Heiple, J., concurring)). Based upon Justice Cunningham's frank admissions at his deposition, I fail to see how he could have honored this principle. Although Cunningham asserted only that he may have been "ticked off," the decision of a lifelong Democrat to publicly renounce his party affiliation and declare his intention to seek election by the opposition evinces a degree of animus which is far more profound. No judge could reasonably be expected to separate such deep personal resentment from his responsibilities as a jurist, especially when one considers that the disappointment came at the very moment the redistricting dispute arrived before the court for a decision.

How the legislative districts are redrawn will affect the citizens of this State for the next decade and beyond. So important a matter should never be left to turn on a judge's hurt feelings or failed political ambitions. I recognize that we cannot say with absolute certainty what was actually going through Justice Cunningham's mind when he cast his vote in the case, but that is not necessary. The judges of this State must avoid even the appearance of impropriety and are obligated to disqualify themselves whenever their impartiality might reasonably be questioned. 134 Ill. 2d Rules 62, 63(C)(1).

This is not only good policy, it is a constitutional imperative. Where, as here, a judge has " 'such a likelihood of bias or an appearance of bias' " that he is unable to hold the balance between the competing interests in a case, due process requires that he be barred from

hearing it. (See *Taylor v. Hayes* (1974), 418 U.S. 488, 501, 41 L. Ed. 2d 897, 909, 94 S. Ct. 2697, 2704-05, quoting *Ungar v. Sarafite* (1964), 376 U.S. 575, 588, 11 L. Ed. 2d 921, 930, 84 S. Ct. 841, 849.) Although due process requirements will sometimes result in the disqualification of judges " 'who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties[,] *** to perform its high function in the best way, ''justice must satisfy the appearance of justice." ' " *Aetna Life Insurance Co. v. Lavoie* (1986), 475 U.S. 813, 825, 89 L. Ed. 2d 823, 835, 106 S. Ct. 1580, 1587, *quoting In re Murchison* (1955), 349 U.S. 133, 136, 99 L. Ed. 942, 946, 75 S. Ct. 623, 625.

By summarily dismissing Rep. Flinn's petition today, the majority here satisfies only the appearance of being in a hurry. Haste was the animating feature of the court's prior disposition in the case (see *Illinois Legislative Redistricting Comm'n v. LaPaille* (N.D. Ill. 1992), 786 F. Supp. 704, 710), and its legacy is a constitutionally infirm map (see *Ryan II*, 147 Ill. 2d 270 (Clark, Freeman, & Bilandic, JJ., dissenting)) which appears to have been approved only because of the thwarted political ambitions of one of the court's past members. This time we have time, and we should use it. While primary elections will be here soon, no demand has been made for immediate, interim relief. We have the opportunity for meaningful deliberation. We should not cast it aside without comment as if it were some unwelcome motion to extend the page limits on a brief.

Where, as here, we have original and exclusive jurisdiction under article IV, section 3, of the constitution (Ill. Const. 1970, art. IV, § 3), there are few fixed procedures. We have recognized, however, that the rules governing cases in circuit court may be an appropriate guide. (134 Ill. 2d R. 382(b).) In the matter before us, Rep. Flinn treats his request for relief as a petition

under section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1992)), which authorizes relief from final orders and judgments more than 30 days after they have been entered. Respondents, the Secretary of State and the Legislative Redistricting Commission, do not dispute that this procedural mechanism should be available to us in original jurisdiction cases. To the contrary, they accept as a given that the matter should be resolved according to the standards applicable to section 2—1401 proceedings.

Section 2—1401 was designed for precisely the situation before us here, namely, to bring before the court matters of fact which were unknown at the time judgment was entered, and if known, would have affected or altered the judgment that was entered. A section 2—1401 petition invokes the equitable powers of the court as justice and fairness require, and it should be considered in light of equitable principles. Relief is granted under this provision in order to achieve justice, and a liberal construction is used to achieve that end. See *In re Marriage of Hoppe* (1991), 220 Ill. App. 3d 271, 282-83.

Respondents urge denial of the petition here because they dispute Rep. Flinn's claim that Cunningham's political animus affected his vote in the case. In summarily granting respondents' request, my colleagues forget that this court has consistently held that where the central facts of the petition are controverted, an evidentiary hearing *must* be held. (*Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 286; see *Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 223.) This is a sound policy for the circuit courts, and it is a sound policy for us.

Regardless of what one thinks of Justice Cunningham and what he did here, there can be no possible harm in at least conducting a hearing on the matter. If the facts are allowed to be developed more fully, we

may well find that Justice Cunningham's admissions are not as explosive or as suggestive of improper conduct as they now appear to be. That would be a service to him, as well as to the courts and the voters. On the other hand, if Justice Cunningham cannot be exonerated, it does not profit us to try to keep the matter hidden now. If we are unwilling to take care of our problems, we are apt to find the Federal courts doing it for us.

As an alternative basis for dismissal of the petition, respondents argue that Rep. Flinn lacks standing to bring it. This is manifestly incorrect. Although Flinn was not a party to the original action and never moved to intervene during the pendency of that action, the law does not require that of him. Relief under section 2—1401 is available not only to parties or privies of parties, but also to anyone " 'directly, injuriously and necessarily' " affected by the challenged judgment. (See *Clayton v. Mimms & Co.* (1979), 68 Ill. App. 3d 443, 445, quoting *In re Burdick* (1896), 162 Ill. 48, 56.) Rep. Flinn was so affected when the redistricting map approved by the judgment challenged here changed the district from which he was elected.

For the foregoing reasons, I would deny respondents' motion to dismiss the petition and would set an evidentiary hearing on Rep. Flinn's allegations. I therefore dissent.

CHIEF JUSTICE BILANDIC and JUSTICE FREEMAN join in this dissent.