(No. 73800.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. AUBREY McCAULEY, Appellee.

*Opinion filed December 22, 1994.—Rehearing denied January 30, 1995.*

416

BILANDIC, C.J., joined by MILLER and HEIPLE, JJ., concurring in part and dissenting in part.

MILLER, J., joined by HEIPLE, J., also concurring in part and dissenting in part.

HEIPLE, J., also concurring in part and dissenting in part.

Roland W. Burris and James E. Ryan, Attorneys General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Randall Roberts, Brian Clauss and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Alan D. Blumenthal and William Walters, of Chicago, and Elisha Rosenblum, law student, for appellee.

David J. Bradford, Locke E. Bowman III and Kathleen M. Banar, of Niles (Cynthia G. Bowman, of Chicago,

of counsel), for *amici curiae* Chicago Council of Lawyers *et al.*

Harvey M. Grossman and Jane M. Whicher, of Chicago, for *amicus curiae* American Civil Liberties Union of Illinois.

Roslyn C. Lieb and Cynthia A. Wilson, of Chicago, for *amicus curiae* Chicago Lawyers Committee for Civil Rights Under Law, Inc.

John J. Rekowski, Public Defender, of Edwardsville, for *amicus curiae* Illinois Public Defenders Association.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Aubrey McCauley, was indicted for first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). Following a pretrial hearing, the trial court suppressed evidence of a lineup identification of defendant and any statements he had made after an attorney, retained by his family, was present at the police station, unsuccessfully requesting to consult with him. The State took an interlocutory appeal, and the appellate court affirmed (228 Ill. App. 3d 893). We granted the State's petition for leave to appeal (134 Ill. 2d R. 315). Several *amici curiae*, including the Chicago Council of Lawyers, the MacArthur Justice Center, the American Civil Liberties Union of Illinois, the Ad Hoc Committee to Support the Illinois Bill of Rights, Illinois Attorneys for Criminal Justice and various public defender agencies and associations have filed briefs in support of defendant. We now affirm in part and reverse in part for reasons which follow.

The following evidence was presented at the pretrial hearing. Detective Robert Kocan testified that on November 20, 1988, at about 5:30 p.m., Chicago police

officers brought defendant to a third-floor interview room in the Area 3 Violent Crimes section of the Chicago police station located at 39th and California Streets. Defendant was brought to the station by police in connection with a shooting death which had occurred the previous day. At around 6 p.m., Detectives Kocan and Thomas Byron began interviewing defendant after first advising him of his *Miranda* rights. Defendant did not ask for a lawyer or say that his family was obtaining one for him. He responded to the detectives' questioning by giving an alibi statement. Kocan and Byron then notified Sergeant Fred Bonke, their supervisor, who was in his third-floor office, that they were leaving the station to interview witnesses in connection with defendant's statement. The detectives left defendant in custody in the interview room and left the station between 6 and 6:30 p.m.

Attorney William O. Walters testified that, shortly before 7 p.m. on that same evening, he received a telephone call from members of defendant's family. Walters immediately telephoned a police station located at 61st and Racine Streets as well as the Area 3 police station to learn where defendant was being held. Police officers, answering the telephone at each station, told Walters that defendant was not present there. At 7 p.m., Walters proceeded to the 61st Street station and was again told by an unidentified police officer that defendant was not present and that Walters should perhaps call the Area 3 station. At about 7:30 p.m., Walters telephoned Area 3 and was told by another unidentified officer that defendant was also not there. Walters, nonetheless, proceeded to the Area 3 station, spoke to the desk sergeant and asked to speak with defendant. The desk sergeant telephoned upstairs to the third floor and advised Walters that an officer would come downstairs to speak with him. According to Walters, the time was 7:40 p.m.

Sergeant Bonke came downstairs, shortly. Walters identified himself as defendant's attorney and asked to speak with defendant. According to Walters, Bonke told him that he could not speak with defendant and refused as well to tell defendant that Walters was present. Bonke told Walters that defendant had not asked to see a lawyer. Bonke and Walters then disagreed as to whether defendant's constitutional rights were being violated by the denial of access. Walters also asked Bonke whether defendant had been arrested. Bonke responded that defendant was voluntarily at the station and was not the target of the investigation. Bonke said that he would call Walters if defendant became the target. Walters testified that this conversation occurred at 7:50 p.m. He remained at the police station for about 10 more minutes, but left at 8 p.m. when it appeared that police would do nothing more.

Bonke testified that he was called downstairs from his third-floor office sometime after 7 p.m. According to Bonke, he conversed with Walters and advised him that defendant had not been charged and that, to Bonke's knowledge, defendant had left the station with the two detectives and that there probably would be a lineup. Bonke denied telling Walters that he could not speak with defendant and denied that Walters asked him to tell defendant that Walters was present. Bonke could not say that he actually knew the detectives were interviewing defendant before they left the station because he was not closely involved. Bonke, however, knew that defendant was a suspect. Bonke also claimed that he had not seen defendant, nor did he know in which interview room he was being held.

Sometime between 8 and 8:15 p.m., Detectives Kocan and Byron returned to the Area 3 station. No one told them that Walters had been at the station. After being unable to locate alibi witnesses, the detectives

told defendant that his alibi did not "check out." They prepared for defendant to participate in a lineup. At around 10 p.m., defendant was placed in a lineup and a witness identified him. At about 11 p.m., the detectives and an assistant State's Attorney interviewed defendant, and he responded by repeating his earlier alibi statement. At about 1 a.m., Kocan was successful in locating defendant's alibi witnesses, who did not support him. A short time later, an assistant State's Attorney approved charges against defendant.

The trial court found that Walters was credible and that Bonke was not. The trial court suppressed evidence of the lineup identification of defendant and any statements he made after Walters was prevented from conferring with him.

On review, the appellate court affirmed the suppression of defendant's statement and lineup identification on the basis that police violated defendant's right against self-incrimination under article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I, § 10).

## ISSUES

The issues present in this appeal are whether the trial court properly suppressed defendant's (a) statement and (b) lineup identification as resulting from a violation of either Federal or State constitutional protections where police denied a retained attorney access to his defendant-client and failed to inform the defendant-client that the attorney was present and available, seeking to consult with him.

### Suppression of Statement

The State argues that where a custodial suspect is unaware that an attorney has been retained to represent him, a valid waiver of the right to counsel may be found under both the fifth amendment of the Federal Constitution and section 10 of article I of the Illinois

Constitution, despite that police do not inform the suspect that the attorney is present and available, seeking to consult with him. The State argues that this court's interpretation of our State constitutional right to counsel under section 10 must be guided by *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135. The State urges that we reverse the trial court's order suppressing defendant's statement, on the basis of *Burbine* and *People v. Griggs* (1992), 152 Ill. 2d 1.

Defendant responds that where police have failed to inform a custodial suspect that his attorney is present and available, seeking to consult with him, there cannot have been a valid waiver of the right to counsel found under section 10, and the suspect's subsequent statements are properly suppressed. Defendant contends that *Burbine* represents a regressive interpretation of fifth amendment protections, which this court should not rely on in interpreting section 10. According to defendant, *People v. Smith* (1982), 93 Ill. 2d 179, and *Griggs*, 152 Ill. 2d 1, reject the Federal constitutional analysis developed in *Burbine* and, thus, necessarily speak for our State constitutional guarantees. Defendant further contends that the police conduct violated his State constitutional rights of due process.

A defendant's right against self-incrimination is guaranteed by the fifth and fourteenth amendments of the United States Constitution and by article I, section 10, of the Illinois Constitution of 1970. This right includes the right to an attorney. A defendant may waive these rights provided that the waiver is voluntary, knowing and intelligent. (*People v. Evans* (1988), 125 Ill. 2d 50, 74.) In determining whether a defendant knowingly and intelligently waived his right to an attorney, a court must consider the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation, without one

circumstance or factor controlling. (*People v. Reid* (1990), 136 Ill. 2d 27, 54-55.) The State bears the burden of proving, by a preponderance of the evidence, that the defendant made a knowing, intelligent and voluntary waiver of his or her rights. See *Reid*, 136 Ill. 2d at 51.

In *Moran v. Burbine*, the United States Supreme Court decided the validity of a custodial suspect's waiver of the fifth amendment right to counsel under circumstances similar to those presented here. The issue presented was whether a custodial suspect's waiver was valid where either "police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him." (*Burbine*, 475 U.S. at 420, 89 L. Ed. 2d at 420, 106 S. Ct. at 1140.) In *Burbine*, an attorney retained by the defendant's sister telephoned the police station where the defendant was being held and stated that she would act as the defendant's counsel in the event police decided to question him. Police misrepresented to the attorney that the defendant would not be questioned. Applying traditional waiver principles, the Court held that neither deliberate deception of a custodial suspect's attorney by police nor their failure to inform him of his attorney's efforts to contact him was conduct relevant to the validity of his waiver of fifth amendment rights. The Court reasoned that a custodial suspect's capacity to comprehend and knowingly relinquish constitutional rights could "surely" not be affected by events of which he was unaware. (*Burbine*, 475 U.S. at 422, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.) While the Court conceded that the withheld information would have likely affected the defendant's *decision* to waive his constitutional rights, it was not information which was essential to his "comprehension" of those rights. *Burbine*, 475 U.S. at 422, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.

The Court further expressed a belief that the level of police culpability in withholding information from custodial suspects was irrelevant to the question of a knowing waiver. "[S]uch conduct is only relevant to the constitutional validity of waiver if it deprives a defendant of knowledge essential to his *ability* to understand the nature of his rights and the consequences of abandoning them." (Emphasis added.) *Burbine*, 475 U.S. at 423, 89 L. Ed. 2d at 422, 106 S. Ct. at 1142.

Thus, under *Burbine*, in determining the validity of a custodial suspect's waiver of the fifth amendment right to counsel, the relevant and narrow inquiry is whether his ability to understand or comprehend his rights has been compromised by the lack of information or the police conduct in withholding that information. Because very few, if any, forms of withheld information, police conduct, or outside events can conceivably compromise a custodial suspect's *ability* to understand or comprehend, *Burbine* necessarily decided, for purposes of waiver under Federal constitutional law, any question concerning the *level* of police culpability, the *manner* in which the attorney was retained, or the suspect's *awareness* of that fact.

*Burbine* is controlling here in terms of any Federal constitutional basis for suppressing defendant's statements. Defendant's waiver of the right to counsel was therefore valid and suppression of defendant's statements was insupportable on fifth amendment grounds.

The day is long past in Illinois, however, where attorneys must shout legal advice to their clients, held in custody, through the jailhouse door. In this case, we determine that our State constitutional guarantees afforded defendant a greater degree of protection. Our State constitutional guarantees simply do not permit police to delude custodial suspects, exposed to interrogation, into falsely believing they are without immediately

available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation. (See Ill. Const. 1970, art. I, §§ 2, 10.) It is apparent that when police are allowed to withhold information from custodial suspects that their attorneys are present and immediately available to offer assistance, enormous pressure builds upon the police to secure statements from those suspects before they either exercise their right to an attorney or somehow learn of their attorneys' presence. Further, by preventing those attorneys from accessing and assisting their clients, police improperly interfere with the suspects' right to their attorneys' presence as well as the attorney-client relationship, itself. The incommunicado interrogation and surrounding coercive environment likely to result from this objectionable practice is exactly the sort of scenario previously condemned by the United States Supreme Court in *Escobedo* and *Miranda*. See *Miranda v. Arizona* (1966), 384 U.S. 436, 457, 16 L. Ed. 2d 694, 714, 86 S. Ct. 1602, 1619 ("[t]his atmosphere carries its own badge of intimidation"); *Escobedo v. Illinois* (1964), 378 U.S. 478, 487, 12 L. Ed. 2d 977, 984, 84 S. Ct. 1758, 1763 ("it 'would be highly incongruous if our system of justice permitted the district attorney, the lawyer representing the State, to extract a confession from the accused while his own lawyer, seeking to speak with him, was kept from him by the police' ").

Three decisions inform our *waiver* analysis, *People v. Smith* (1982), 93 Ill. 2d 179, *People v. Holland* (1987), 121 Ill. 2d 136, and *People v. Griggs* (1992), 152 Ill. 2d 1. These decisions, along with the 1970 Constitutional Convention proceedings, demonstrate that requirements under our State constitutional guarantee (Ill. Const. 1970, art. I, § 10) differ substantially from the Federal and support suppression of defendant's statements under the circumstances presented here. Regardless of

the United States Supreme Court's *current* views on waiver of the right to counsel under the Federal Constitution, the law in Illinois remains that "when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him." *Smith*, 93 Ill. 2d at 189.

We also reject the notion that little regard should be accorded to defendant's due process claim. Illinois courts have long recognized that the State due process guarantee (Ill. Const. 1970, art. I, § 2) is implicated whenever the State engages in conduct towards its citizens deemed oppressive, arbitrary or unreasonable. (See G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 11 (1969) (commenting on historical development of Illinois constitutional due process concepts); see also *People v. Lewis* (1952), 413 Ill. 116, 122 (failure of authorities to provide counsel, under the circumstances, violated due process under Illinois constitution); *People v. Price* (1962), 24 Ill. 2d 46 (deliberate denial of counsel, failure to inform of right to counsel, and mental compulsion rendered confession involuntary and violated State due process guarantee).) The United States Supreme Court, in *Burbine*, recognized that a defendant's *Federal* due process rights might even be violated in instances where police conduct is sufficiently egregious. (See *Burbine*, 475 U.S. at 432, 89 L. Ed. 2d at 428, 106 S. Ct. at 1147 (finding that police deception more egregious than falsely telling a nonpresent, telephoning defendant's lawyer that the defendant faced no imminent interrogation could rise to level of Federal due process violation).) Contrary to the view expressed by the State, we believe defendant sufficiently asserted a due process claim of error by arguing that the police

should have allowed attorney Walters to consult with him. We further believe that the police conduct here violated State constitutional due process.

We address first the validity of defendant's waiver. It is unquestionable that State courts have the authority to interpret their respective constitutional provisions more broadly than United States Supreme Court interpretations of similar Federal constitutional provisions. (See *Oregon v. Hass* (1975), 420 U.S. 714, 719, 43 L. Ed. 2d 570, 575-76, 95 S. Ct. 1215, 1219.) The United States Supreme Court expressly recognized that its *Burbine* decision was at odds with decisions by the majority of State courts, including *Smith*, as well as the policy recommendations of the American Bar Association. (*Burbine*, 475 U.S. at 427-28, 89 L. Ed. 2d at 425, 106 S. Ct. at 1144.) The Court consequently stated, "Nothing we say today disables the States from adopting *different requirements* for the conduct of [their] employees and officials as a matter of state law." (Emphasis added.) *Burbine*, 475 U.S. at 427-28, 89 L. Ed. 2d at 425, 106 S. Ct. at 1144.

A close review of *Smith*, *Holland* and *Griggs* reveals that Illinois accepted this invitation and developed different requirements which are supported under our State constitution and its laws.

Well before the Supreme Court decided *Burbine*, this court, in *Smith*, addressed the issue of whether a custodial suspect's statements were properly suppressed as violative of the right to counsel during custodial interrogation. (See *Smith*, 93 Ill. 2d 179.) In *Smith*, police told an associate of counsel retained by the defendant that she could not see the defendant because he was undergoing withdrawal from drugs. In deciding whether the defendant's waiver of the fifth amendment right to counsel was knowing and intelligent, *Smith* relied extensively not on Federal precedent, but on a

sister State's interpretation of State constitutional law. (See *State v. Haynes* (1979), 288 Or. 59, 602 P.2d 272.) In *Haynes*, the police prevented an attorney retained by the custodial suspect's wife from conferring with him. The Oregon Supreme Court, as a result, adopted a rule that where police " 'have failed to admit counsel to a person in custody or to inform the person of the attorney's efforts to reach him, they cannot thereafter rely on defendant's "waiver" for the use of his subsequent uncounseled statements or resulting evidence against him.' " (See *Smith*, 93 Ill. 2d at 187-88, quoting *Haynes*, 288 Or. at 72-74, 602 P.2d at 278-79.) *Smith* found persuasive the *Oregon Supreme Court's* reasoning that *under State law* police possessed no authority to prevent or delay communication between an arrested person and his retained lawyer, and also that *a custodial suspect's decision to waive counsel's assistance was likely to be affected by the withheld information. Smith* also found persuasive at least one other State-law decision which reached a similar conclusion under its own State constitution. See *State v. Matthews* (La. 1982), 408 So. 2d 1274; *Smith*, 93 Ill. 2d at 188 (citing cases).

*Smith*'s analysis also relied to a more limited extent on previous statements by the United States Supreme Court indicating that police prevention of a custodial suspect's attorney from consulting with him, under certain circumstances, constituted a violation of the sixth amendment right to counsel. *Smith*, 93 Ill. 2d at 188-89, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 465 n.35, 16 L. Ed. 2d 694, 718 n.35, 86 S. Ct. 1602, 1623 n.35 (referring to *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758); see also *Holland*, 121 Ill. 2d at 167-68 (Clark, C.J., specially concurring) (providing historical background to State-law decisions which are at odds with *Burbine*).

This court held in *Smith*, relying primarily on State authorities:

> "[W]hen police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him." *Smith*, 93 Ill. 2d at 189.

Because of the scope of its holding, *Burbine,* however, necessarily overruled *Smith sub silentio* as grounded in the fifth amendment and, therefore, Federal constitutional law. Recall that *Burbine* essentially holds that unless a custodial suspect's "capacity" or "ability" to "comprehe[nd]" his abstract fifth amendment right to an attorney is affected, no form of police conduct towards the suspect's attorney, personally retained or otherwise, present or otherwise, or the failure of the police to inform the suspect of the attorney's efforts to reach him can invalidate the suspect's waiver of those rights. (See *Burbine*, 475 U.S. at 422, 423, 89 L. Ed. 2d at 421, 422, 106 S. Ct. at 1141, 1142.) *Burbine* conceded that while such conduct or information, if known by the suspect, might affect the suspect's "decision" to waive his rights, this was not "knowledge" essential to his "ability" to "understand" the "nature" of his rights. (See *Burbine*, 475 U.S. at 423, 89 L. Ed. 2d at 422, 106 S. Ct. at 1142.) *Burbine* clearly conflicts with *Smith,* as standing on Federal law, in terms of the relevance both of police conduct and of information that retained counsel is available.

Moreover, while *Burbine* may be *factually* distinguishable from *Smith* in several respects, those distinctions carry absolutely no *legal* significance for purposes of deciding a knowing waiver under the fifth amendment. (In *Burbine,* the defendant was unaware of counsel's retention and counsel did not request access to the defendant, nor was counsel ever present at the police station. In *Smith,* the defendant retained an attorney whose associate was present at the police

station and requested access to the defendant, but was denied.) *Burbine* makes clear that, under the Federal Constitution, nothing the police do or no information a suspect has or is deprived of can be relevant unless it affects the suspect's "ability" or "capacity" to comprehend or understand the nature of his rights. A distinction based on a suspect's knowledge of whether he personally retained an attorney or knew an attorney was retained, or whether the attorney was on the telephone or at the door of the interrogation room asking to consult with the suspect, simply has no basis under Federal law.

In response to the Supreme Court's express invitation to the States to adopt different requirements as a matter of State law (*Burbine*, 475 U.S. at 427-28, 89 L. Ed. 2d at 425, 106 S. Ct. at 1144), State courts uncomfortable with *Burbine*'s reasoning rejected it and formulated requirements resting on State constitutional grounds. *State v. Stoddard* (1988), 206 Conn. 157, 537 A.2d 446; *Bryon v. State* (Del. 1990), 571 A.2d 170; *Haliburton v. State* (Fla. 1987), 514 So. 2d 1088; *People v. Wright* (1992), 441 Mich. 140, 490 N.W.2d 351; *State v. Reed* (1993), 133 N.J. 237, 627 A.2d 630.

In *Holland*, the defendant requested that this court follow *Smith*, rather than *Burbine*, to decide a claimed violation under article I, section 10, of the Illinois Constitution. In deciding the State constitutional claim, the court declined to apply *Smith*, finding that *Smith* and *Burbine* were factually distinguishable, but that the facts of *Holland* were consistent with those of *Burbine*. The court relied on two points: as in *Burbine*, relatives had hired the attorney so that the defendant was unaware that the attorney had been retained; and, as in *Burbine*, the attorney had simply telephoned police, asking to be contacted if the defendant was questioned. The *Holland* court found *Smith* distinguishable because

the defendant there had personally retained the attorney, and the attorney's associate had been present at the jailhouse. The *Holland* court held that the defendant's waiver was valid, as in *Burbine*, on the basis that the case factually tracked *Burbine*, more so than *Smith*. In *Griggs*, this court would later state that the facts of *Holland* were distinguishable from those of *Smith* because, unlike *Smith*, there had been no "wrongful denial of attorney access and no reason to apply the rule of *Smith* to the facts presented in *Holland*." *Griggs*, 152 Ill. 2d at 24.

Parenthetically, *Holland*'s factual reliance on *Burbine* is problematic. *Burbine* holds that a knowing waiver of the right to counsel only implicates a suspect's *abilities* and *capacities to understand* the nature of his rights; information affecting a suspect's decision to waive those rights is irrelevant. Given such a broad, conceptually based holding, *Burbine*'s application to a given case cannot depend on factual variables such as the manner or the suspect's awareness of the attorney's retention, the attorney's mode of communicating with police, or whether police denied him access to the suspect. The problem with *Holland* is that it adopts *Burbine*'s conclusion (the waiver was knowing and therefore valid) based simply on a finding that certain legally insignificant facts in *Burbine* were similar. The full import of *Burbine*'s holding was apparently not appreciated or considered by *Holland*. Simply put, the fifth amendment holding in *Burbine* is much broader than its facts, and *Holland*, seemingly, did not recognize this. See *Burbine*, 475 U.S. at 413-14, 89 L. Ed. 2d at 416, 106 S. Ct. at 1136-37.

Returning to the subject of legal grounds, it is significant that this court did not overrule *Smith*. This fact is significant because, after the *Burbine* decision, there is no basis on which *Smith* can stand as a Federal law de-

cision. In deciding the defendant's article I, section 10, claim, *Holland* merely distinguished *Smith* on its facts, thus confirming its continued viability and standing on State-law grounds. It is also significant that the *Holland* court expressed no unwillingness to apply *Smith,* under article I, section 10, to instances where an attorney was denied access to his client. (*Cf. Holland,* 121 Ill. 2d at 169, 172 (Clark, C.J., specially concurring) (noting that the majority's "attempt to distinguish *Smith* preserves for later consideration the issue of whether our State Constitution grants a broader privilege against self-incrimination in cases where the attorney is actually present").) Clearly, considering this court's refusal to overrule *Smith* as well as the Supreme Court's invitation to the States, *Smith*'s rule was intended to be preserved as an appropriate State-law requirement under our own constitution. *Cf. Griggs,* 152 Ill. 2d at 37 (Miller, C.J., dissenting) (describing *Smith* as being "preserved and narrowed" by *Holland*); *Bryon v. State* (Del. 1990), 571 A.2d 170 (relying on *Weber v. State* (Del. 1983), 457 A.2d 674, a pre-*Burbine* decision, as grounded in that State's constitution); *Roeder v. State* (Tex. App. 1988), 768 S.W.2d 745 (relying on *Dunn v. State* (Tex. Crim. App. 1985), 696 S.W.2d 561, a pre-*Burbine* decision, as grounded in that State's constitution).

*Griggs* presented this court with a second opportunity to reexamine *Smith* and *Burbine.* In *Griggs,* the indications that this court intended to preserve *Smith*'s requirements for police conduct as State law became even stronger. In this regard, *Griggs* bears close examination, not only in terms of its substance, but also in terms of the grounds supporting the decision. *Griggs* is grounded in State law.

First, *Griggs*' analysis relied almost entirely on State decisional law. *Griggs* referred extensively to pre-*Burbine* and post-*Burbine* State-constitutional-law deci-

sions, reaching conclusions contrary to *Burbine*, but similar to *Smith*. (See *Griggs*, 152 Ill. 2d at 25-28.) *Griggs* not only expressly reaffirmed *Smith* and relied extensively on its reasoning, but also quoted, at length, benchmark language from *Haynes*, a pre-*Burbine* State-law decision. (See *Griggs*, 152 Ill. 2d at 25-29; see also Note, *Developments in the Law*, 95 Harv. L. Rev. 1324, 1389-90 (1982) (describing "retroactive incorporation," a process whereby a State court adopts as a matter of State constitutional law its own earlier Federal constitutional interpretation).) *Griggs*, furthermore, declined to follow *Burbine*, relying on State-law authorities and the views of the *Burbine* dissenters to reject *Burbine*'s basic premises. (*Griggs*, 152 Ill. 2d at 25, 27-28.) Simply in terms of the authorities it relied on, *Griggs* constitutes a State-law decision. See Lohraf, *United States v. Leon and Illinois v. Gates: A Call for State Courts to Develop State Constitutional Law*, 1987 U. Ill. L. Rev. 311, 342 (recommending that State courts rely on State-specific factors, opinions of other State courts and the incorporation as State law of prior State decisions that relied on Federal law to avoid Supreme Court review of divergent opinions); see also *Michigan v. Long* (1983), 463 U.S. 1032, 1041, 77 L. Ed. 2d 1201, 1214, 103 S. Ct. 3469, 3476 (when State-court decisions clearly based on State law that is adequate and independent, Supreme Court will not review decision).

*Griggs* is also a State-constitutional-law decision in terms of the substance of its analysis. In *Griggs*, this court unequivocally rejected *Burbine*'s fundamental premises that police interference with an attorney's access to a custodial-suspect client is irrelevant to waiver of the right to counsel during custodial interrogation and that the information that a retained attorney is available is simply helpful and constitutionally irrelevant to a knowing waiver. *Griggs* stated, directly contrary to the holding of *Burbine*:

"*We do not* consider that police interference with an attorney's access to a client has 'no bearing on [a defendant's] capacity to comprehend and knowingly relinquish a constitutional right.' [Citation.] Since *we do not deem constitutionally irrelevant* police interference with an attorney's access to a client, *we do not* agree that a waiver so obtained may be said to have been 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " (Emphasis added.) (*Griggs*, 152 Ill. 2d at 27, quoting *Burbine*, 475 U.S. at 421-22, 89 L. Ed. at 421, 106 S. Ct. at 1141.)

Similarly, *Griggs* stated:

"[T]o have specifically informed defendant of the attorney's immediate availability in no way would have required the police to supply a 'flow of information' designed to help the defendant 'calibrate his self-interest.' " *Griggs*, 152 Ill. 2d at 28, quoting *Burbine*, 475 U.S. at 422, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.

Relying on the *Burbine* dissenters' reasoning, *Griggs* again expressed disagreement with the majority's reasoning concerning the constitutional significance of the withheld information:

"There is a valid distinction to be made between failure to provide generally useful information and 'affirmative police interference in a communication between an attorney and a suspect [when the information withheld by the police] bears directly on the right to counsel that police are asking the suspect to waive.' " (*Griggs*, 152 Ill. 2d at 27-28, quoting *Burbine*, 475 U.S. at 456 n.42, 89 L. Ed. 2d at 443 n.42, 106 S. Ct. at 1159 n.42.)

Indeed, *Griggs* expressed the view, soundly rejected by *Burbine*, that not requiring the police to inform a suspect resulted in his impermissible isolation. *Griggs*, 152 Ill. 2d at 28.

In concluding the analysis, *Griggs* quoted both the holding of *Smith* and a statement from a post-*Burbine* State-law decision, which disagreed with *Burbine*'s reasoning:

" '*We are unwilling*, however, *to dismiss counsel's efforts to communicate as constitutionally insignificant* to the capacity of the suspect to make a knowing and intelligent choice of whether he or she will invoke the right to counsel.' " (Emphasis added.) *Griggs*, 152 Ill. 2d at 28, quoting *Stoddard*, 206 Conn. at 167-68, 537 A.2d at 452-53.

By endorsing this view, *Griggs* rejected both *Burbine*'s notion that information of certain events could have no bearing on a suspect's "capacity" or "ability" to comprehend his rights and that a suspect's waiver decision does not implicate the opportunity to be advised by counsel. It could not be any clearer that this court, in *Griggs*, completely disagreed with the United States Supreme Court about what constitutes a knowing waiver of the constitutional right to counsel during custodial interrogation. It could not be any clearer that this court also accepted the Supreme Court's invitation concerning requirements for police conduct grounded in State law. While *Griggs* relied to a limited extent on a factual distinction (the suspect's awareness that counsel was retained), which might support the decision as being grounded in Federal law, that distinction is dwarfed in comparison to *Griggs*' fundamental rejection of *Burbine*'s basic premises.

The State, itself, acknowledges that there is an "unnecessary tension" between *Burbine* and *Griggs*. The State, however, views *Griggs* as a Federal decision which simply "deviat[es]" from *Burbine*, rather than a State-law decision which rejects the very premises of *Burbine*'s constitutional analysis.

The extent of this court's disagreement with *Burbine*'s basic premises and the extent of its reliance on other State-law authorities make clear, however, that *Griggs* represents State constitutional law. (See Welsh, *Reconsidering the Constitutional Relationship Between State and Federal Courts: A Critique of Michigan v.*

*Long*, 59 Notre Dame L. Rev. 1118, 1123 (1984) (United States Supreme Court in deciding jurisdictional grounds supporting a decision adheres to the "say-so" view: State judges *make* whatever law they say they are making).) Concerning this point, it would be difficult to conceive that *Griggs* would fail the "adequate and independent state grounds" test referred to in *Michigan v. Long*, 463 U.S. at 1039, 77 L. Ed. 2d at 1212, 103 S. Ct. at 3475. (See Note, *Developments in the Law*, 95 Harv. L. Rev. 1324, 1331 (1984) (jurisdictional principles which guide Supreme Court in deciding when to review State court decisions involving State-law questions are central determinants of State constitutional law's independence from Federal constraints).) Certainly also, the factual distinction which *Griggs* unnecessarily attempted is conceptually meaningless as a statement of Federal law. (See *Griggs*, 152 Ill. 2d at 38 (Miller, C.J., dissenting) (distinction based on defendant's awareness that counsel was retained is "simply illusory").) Indeed, the State has conceded this point. Under *Burbine*'s analysis, a suspect's waiver would be no less knowing and intelligent where police failed to inform the suspect that his expected, identifiable or known retained attorney was available. *Burbine* clearly decided the issue, under Federal law, as to whether a suspect's waiver could be knowing and intelligent, despite the withholding of information by police from the suspect that his anticipated or identifiable counsel was available. Simply put, there is no tenable basis in Federal constitutional law for the *Griggs* decision.

Both parties in the present case claim that *Griggs* supports their respective positions. We note that the State's argument obtains regardless of the fact that *Griggs* represents State-constitution decisional law. The State claims that the present case is factually distinguishable from *Griggs* because defendant here was unaware that an attorney had been retained.

The State claims that we must follow *Burbine* as we interpret our State guarantee because *Griggs* turns on this factual distinction. According to the State, a suspect's awareness of the retention of an attorney reflects the suspect's participation in the process. According to the State, such participation, if known to police, is an effective invocation of the right to counsel during custodial interrogation. According to defendant, however, the factual distinction in *Griggs* resulted from this court's reluctance to go beyond the facts presented; the defendant's awareness of his attorney's retention was not critical to the court's constitutional analysis.

We first note that in the context of deciding State guarantees, Federal authorities are not precedentially controlling; they merely guide the interpretation of State law. See *Rollins v. Ellwood* (1990), 141 Ill. 2d 244, 275 (while this court may, in construing State due process guarantee, look for "guidance and inspiration" to constructions of Federal guarantee by Federal courts, final conclusions on construction of State guarantee are for this court to decide).

There is little indication in the *Griggs* decision regarding the basis for its factual distinction. In *Holland*, the defendant's awareness that counsel had been retained was seemingly related to his invocation of the right to counsel as opposed to establishing his knowledge for purposes of waiver. (See *Holland*, 121 Ill. 2d at 153 (distinguishing the facts from *Smith*, the court stated that "[h]ere, as in *Burbine*, a relative secured counsel for the suspect; the suspect was unaware" and "[i]n *Smith*, the suspect actually met with an attorney after his arrest and personally retained him").) The *Griggs* court, however, later appeared to view *Holland* as turning on the fact that there had been no wrongful denial of attorney access as opposed to the unawareness of counsel's retention by the defendant. See *Griggs*, 152

Ill. 2d at 24 ("[s]ince there was no evidence that the attorney requested access to the client, there could have been no wrongful denial of attorney access and no reason to apply the rule of *Smith*").

Very significantly, *Smith*'s rule, as originally stated, has application regardless of the manner in which the attorney-client relationship arises. (*Smith*, 93 Ill. 2d at 189 ("when police *** refuse an attorney *appointed or retained* ***") (emphasis added).) In point of fact, also, *Smith*'s rule was based on decisions where relatives had retained counsel for the suspect, without mention of whether he was aware of counsel's retention or not. *Smith*, 93 Ill. 2d at 186-88 (citing cases).

We believe that this factual distinction, based on the defendant's awareness of counsel's retention, was unnecessary to both the result in *Griggs* as well as its rationale. The distinction is susceptible to being eliminated from the opinion without substantially affecting either. Certainly, *Griggs*' conceptual disagreement with *Burbine* does not depend whatsoever on this legally irrelevant distinction. It would seem that *Griggs* relied on this factual difference simply to bolster its rejection of *Burbine* and as an attempt, as well, to apply the *facts* of *Smith*, in the narrowest possible sense, to the State claim before it. The rule of *Smith*, however, applies where a suspect is not informed that his attorney is present, unsuccessfully seeking access to him. A suspect's awareness of his attorney's retention or the manner of the attorney's hire is simply not decisive of *Smith*'s application.

We do not accept that this highly questionable factual distinction is a sufficient basis to differentiate this case from the reasoning and result in *Griggs*. Although in both cases the defendant's family retained counsel for him, in *Griggs* the defendant was fortunate enough to allege that he knew about it. It is more than

likely that in most cases where families of custodial suspects have retained legal counsel for them, the suspects "knew" their families were doing so, whether based on having a family lawyer, prior practice, some limited form of communication, or simply a "hunch." How else, without generally involving some sort of communication between them, would families of suspects know that the suspects were in custody and needed an attorney?

Further and more importantly, we are not prepared to allow the interpretation of our State constitutional requirements to turn on such an arbitrary and unprincipled distinction. What is the legal significance, in terms of our State guarantee, of a suspect's awareness of counsel's retention? The stated holding in *Griggs* bears witness to the utter lack of a conceptual difference between that case and the present case:

> "If the circuit court finds *that defendant knew that an attorney was being retained for him*, that the attorney was present and had requested access to defendant *** and that police refused to so inform defendant of the immediate availability of his attorney, the circuit court shall allow defendant's motion to suppress. *** Under these circumstances, there would have been no knowing waiver of defendant's constitutional right against self-incrimination." (Emphasis added.) (*Griggs*, 152 Ill. 2d at 30.)

It is highly unlikely that any defendant, including the defendant here, if offered the opportunity to show that he was somehow aware of counsel's retention, would not be able to do so. Thus, to the extent that this distinction is advanced as legally significant, a different result in this case as compared to that in *Griggs* would be unfair.

We conclude that *Holland* preserved the *Smith* rule as an appropriate interpretation of our State constitutional guarantees. (See *Holland*, 121 Ill. 2d at 166 (Clark, C.J., specially concurring).) This court in *Griggs* then expressly reaffirmed and relied on *Smith*'s rationale as

a matter of State constitutional law to reject *Burbine*'s Federal constitutional analysis. (See *State v. Opperman* (S.D. 1976), 247 N.W.2d 673, 675 (affirming rationale of earlier decision as a matter of State constitutional law).) Thus, *Griggs* as well as *Smith* necessarily constitute State law which may properly guide this court in deciding defendant's rights under section 10 of article I of our State constitution. (See J. Nowak, R. Rotunda & J. Young, Treatise on Constitutional Law ch. 1.6, at 69-72 (2d ed. 1992) (State courts possess ultimate authority to interpret State law).) Rather than blindly follow the reasoning of a United States Supreme Court decision at all costs, this court determines to continue the independent trend it began in *Holland* and *Griggs*, clarify the State grounds of *Griggs* as well as its problematic factual distinction, and apply the *Smith* rule to defendant's article I, section 10, claim.

Justice Simon's admonition bears repeating. "It is the nature of the Federal system that we, as the justices of the Illinois Supreme Court, are sovereign in our own sphere; in construing the State Constitution we must answer to our own consciences and rely upon our own wisdom and insights. 'If we would guide by the light of reason, we must let our minds be bold.' " *People v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, 147 (Simon, J., specially concurring), quoting *New State Ice Co. v. Liebmann* (1932), 285 U.S. 262, 311, 76 L. Ed. 747, 771, 52 S. Ct. 371, 387 (Brandeis, J., dissenting, joined by Stone, J.).

That our State self-incrimination guarantee does not countenance the police conduct here is evidenced by yet another consideration. The 1970 Illinois Constitutional Convention debates indicate that the delegates intended that article I, section 10, incorporate then-existing Federal constitutional principles regarding incommunicado interrogation. (See *People v. DiGuida* (1992), 152 Ill. 2d 104 (court will look to intent behind

our constitution in order to determine whether comparable provisions of our State constitution should be interpreted similarly to those of the Federal Constitution).) At the time of the debates, the cases of *Escobedo*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, and *Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, were of recent vintage.

Delegate Weisberg, a member of the Committee on the Bill of Rights, who had argued *Escobedo* before the Supreme Court, assured the convention at large that the committee had decided that "whichever phrasing were to be put into *** section 10, that the existing state of the law would remain unchanged." (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1377.) None of the delegates who participated in the debate took issue with Weisberg's statements. They were also fully apprised by the convention essays and other provided materials of *Escobedo*'s and *Miranda*'s then-accepted interpretations, and were also informed of the import of retaining language from the former constitution (see S. Gove & V. Ranney, Con-Con: Issues from the Illinois Constitutional Convention 3, 24-35, 30, 48 (1970); G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 43-45 (1969)).

Based on *Smith, Holland, Griggs* and the proceedings of the constitutional convention, it is clear that the suppression of defendant's statements was supported under our State guarantee against self-incrimination.

This court has not consistently applied the so-called lockstep doctrine as an assist in interpreting article I, section 2, the due process clause in our State constitution. In fact, this court has expressly asserted its independence in interpreting this particular provision of our constitution. (See *Rollins v. Ellwood* (1990), 141 Ill. 2d 244, 275; *People ex rel. Burris v. Ryan* (1991), 147 Ill. 2d 270, 280.) We should not hesitate then to independently

consider whether the police conduct here also violated due process principles under our State constitution.

Due process preserves an individual's personal and property rights from the arbitrary action of public officers. (See *People v. Belcastro* (1934), 356 Ill. 144, 147.) "The essence of due process is 'fundamental fairness.'" (*Burris*, 147 Ill. 2d at 310 (Bilandic, J., dissenting), quoting *Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 24, 68 L. Ed. 2d 640, 648, 101 S. Ct. 2153, 2158.) Due process essentially requires "fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections." (See *Burbine*, 475 U.S. at 467, 89 L. Ed. 2d at 450, 106 S. Ct. at 1165 (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.).) Furthermore, due process contemplates that police act in an accusatorial, not an inquisitorial, manner. See *Walls v. State* (Fla. 1991), 580 So. 2d 131, 133.

In Illinois, due process of law requires that an accused shall be given the *benefit* of counsel. (See *United States ex rel. Hall v. Ragen* (N.D. Ill. 1945), 60 F. Supp. 820, 821.) Due process also requires that an accused is entitled to counsel *during* any custodial interrogation. (See 11A Ill. L. & Prac. *Constitutional Law* § 477, at 410 (1981).) The State due process guarantee (article I, section 2) provides the general basis for an accused's right to the assistance as well as presence of counsel during any custodial interrogation.

As a general matter, the right to the assistance of counsel has been afforded historically a certain degree of judicial solicitude and due process protection in Illinois. Along with other circumstances, the deliberate denial to a suspect of counsel's assistance has resulted in an involuntary confession violative of due process. (See *People v. Price* (1962), 24 Ill. 2d 46, 58.) So too, the failure to appoint counsel, under certain circumstances,

has also violated due process. (*People v. Lewis* (1952), 413 Ill. 116, 122.) Further, the right to the assistance of counsel has not been considered satisfied by the mere formality of an appointment of an attorney, but has required effective representation, and where the representation was of such low caliber as to amount to no representation, due process was again held violated. (See *People v. De Simone* (1956), 9 Ill. 2d 522; *cf. People v. Albanese* (1984), 104 Ill. 2d 504.) Similarly, it has been recognized that any restriction on the rights of an attorney to give advice seriously impairs the constitutional rights of the client to receive that advice and thus also violates due process. (See *People ex rel. Kunce v. Hogan* (1976), 37 Ill. App. 3d 673.) It is also recognized that an accused has the right to be represented by retained counsel of his own choosing. See *People v. Johnson* (1979), 75 Ill. 2d 180, 185.

Concerning, in particular, the right to the presence of counsel during custodial interrogation, it is not sufficient for authorities to merely advise a suspect of a *generalized right* to an attorney. (*Cf. Haynes*, 288 Or. at 71, 602 P.2d at 278 (right enforced is not generalized right to counsel, but "more concretely, the derivative *right to the benefit of counsel's efforts* to forestall involuntary incriminating disclosures") (emphasis added).) There are certain requirements that are affixed to the right which seek to ensure its practical effectuation. Authorities must inform suspects that if they cannot afford an attorney, one will be provided, and that they may ask for one at any time and upon doing so, the interrogation must cease. Furthermore, it is not required that a suspect's request for counsel be absolutely articulate, because a sufficient but clear indication of a desire for counsel will trigger the entitlement. See *People v. Krueger* (1980), 82 Ill. 2d 305, 310-11.

In addition, the citizens of Illinois have historically

recognized, even before *Miranda*, a statutory right of persons in custody to consult with their retained counsel and a concomitant duty on the part of public officers to admit such counsel to persons in custody. See Ill. Rev. Stat. 1874, ch. 38, par. 229 (all "public officers *** having the custody of any person *** restrained of his liberty *** shall *** admit any practicing attorney *** whom such person *** may desire to see or consult, to see and consult such person"); Ill. Rev. Stat. 1951, ch. 38, par. 449.1 ("[w]hoever shall, while holding another person in custody, deny that other person his right to consult and be advised by an attorney ***, whether or not such person is charged with a crime *** shall be fined"), par. 477 (formerly section 229); Ill. Rev. Stat. 1959, ch. 38, par. 449.1 (same), par. 477 (same); Ill. Rev. Stat. 1961, ch. 38, par. 736b (formerly section 449.1), par. 736c (formerly section 477).

Section 103—4 of the Code of Criminal Procedure of 1963 incorporates all of these formerly operational provisions, providing that "any person committed, imprisoned or restrained of his liberty for any cause whatever and whether or not such person is charged with an offense shall *** be allowed to consult with any licensed attorney at law *** whom such person may desire to see or consult." (Ill. Rev. Stat. 1987, ch. 38, par. 103—4.) The committee comments to section 103—4 state that the provision incorporates former section 736c. The committee comments also state that the present section 103—4 includes the right to consult and be advised by an attorney at law whether charged or not, formerly provided in section 736b; and the right that "[i]n all cases counsel shall have access to persons confined and shall have the right to see and consult such persons in private," which was formerly provided in section 730. See Ill. Ann. Stat., ch. 38, par. 103—4, Committee Comments—1963, at 49 (Smith-Hurd 1980).

These provisions address process designed to ensure fundamental fairness to persons in custody. See Comment, *Right to Communicate With Retained Counsel Upon Detention Or Arrest: State Statutory Guarantees,* 1962 U. Ill. L. F. 641, 646 (referring to Ill. Rev. Stat. 1961, ch. 38, pars. 736(b), (c), and commenting that State legislatures are probably afforded the best opportunity to balance competing policies attendant to custodial interrogation within the flexible constitutional framework of due process).

Considering these facts and principles, it is clear that the constitutional and statutory policies of our State favor a person *having* the assistance of counsel during custodial interrogation and contemplate prohibiting interference with that assistance by governmental authorities. If a defendant is entitled to the benefit of an attorney's assistance and presence during custodial interrogation and this right is guarded, certainly fundamental fairness requires that immediately available assistance and presence not be denied by police authorities. Put another way, due process is violated when police interfere with a suspect's right to his attorney's assistance and presence by affirmatively preventing the suspect, exposed to interrogation, from receiving the immediately available assistance of an attorney hired or appointed to represent him. (See *Bryon v. State* (Del. 1990), 571 A.2d 170 (holding that the police denial of the assistance of counsel to the defendant violated Delaware's due process provision); *Haliburton v. State* (Fla. 1987), 514 So. 2d 1088 (holding that the police denial of an attorney's access to his client violated Florida due process provision).) To do so is clearly and fundamentally unfair. "[P]olice interference in the attorney-client relationship is the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause

prohibits.... Just as the government cannot conceal from a suspect material and exculpatory evidence, so too the government cannot conceal from a suspect the material fact of his attorney's communication." See *Haliburton*, 514 So. 2d at 1090.

The trial court properly suppressed defendant's statements based on State decisional law (*Smith* and *Griggs*) interpreting the privilege against self-incrimination under the Illinois Constitution. The record shows that police refused defendant's retained attorney's access to defendant and did not inform defendant that his attorney was present at the station, seeking to consult with him. Under such circumstances, the State failed to satisfy its heavy burden of showing that there had been a knowing waiver of the right to counsel under article I, section 10. While we recognize that an accused alone invokes the right to counsel, we are unwilling to dismiss an available retained or appointed attorney's efforts to gain access to his suspect-client as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice to relinquish his right to the attorney's presence.

> "*Miranda* warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel 'only means that for the moment the suspect is foregoing the exercise of that conceptual privilege ***. To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice ***. A suspect indifferent to the first offer may well react quite differently to the second.' " (*Stoddard*, 206 Conn. at 168, 537 A.2d at 453, quoting *Haynes*, 288 Or. at 72, 602 P.2d at 280.)

Certainly, "when the opportunity to consult is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity." (*Haynes*, 288 Or. at 75, 602 P.2d at 280.) "The critical inquiry is whether the information

withheld by the police would have changed the defendant's appraisal and understanding of the circumstances of the waiver." *Wright*, 441 Mich. at 151, 490 N.W. 2d at 356, citing *Stoddard*, 206 Conn. at 175, 537 A.2d at 456.

Moreover, the police conduct here is not simply a failure to supply generally useful information, but a failure to apprise defendant of communications from his attorney bearing directly on the right to counsel. (See *Burbine*, 475 U.S. at 456 n.42, 89 L. Ed. 2d at 443 n.42, 106 S. Ct. at 1160 n.42 (Stevens, J., dissenting).) Defendant was thus denied information necessary to knowingly and intelligently waive his right to his attorney's presence as well as the actual and immediately available assistance of his own attorney. (*Cf. People v. Hobson* (1976), 39 N.Y.2d 479, 348 N.E.2d 894 (attempt by State authorities to secure waiver of right to counsel in absence of the retained or assigned attorney constituted breach of Disciplinary Rule 7—104(A)(1) of the American Bar Association Code of Professional Responsibility and constitutional due process).) The police conduct thus violated defendant's privilege against compelled self-incrimination as well as his right to due process. "No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, [his] rights." (Emphasis omitted.) (*Escobedo*, 378 U.S. at 490, 12 L. Ed. 2d at 985, 84 S. Ct. at 1764.) If our system is, indeed, such a system, we have no reason to fear both lawful and protected consultation. The trial court did not err in suppressing defendant's statements on the basis of our State constitutional rights and privileges.

### Suppression of Lineup Identification

The State argues that exclusion of defendant's lineup identification is insupportable under either section 10 (privilege against self-incrimination) or section 2 (due process protections) of article I of the

Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 10). We agree.

While we have found that defendant's statement was properly suppressed due to the invalidity of a purported waiver of the right to counsel under section 10, which also violated due process, it does not follow that suppression of evidence of the lineup identification was also proper.

Section 10 " 'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature ***.' " (*People ex rel. Bowman v. Woodward* (1976), 63 Ill. 2d 382, 385, quoting *Schmerber v. California* (1966), 384 U.S. 757, 761, 16 L. Ed. 2d 908, 914, 86 S. Ct. 1826, 1830.) This court has also determined that a pretrial lineup does not involve compelling an accused to give evidence of a testimonial nature. (See *People v. Nelson* (1968), 40 Ill. 2d 146, 153.) As a consequence, section 10 extends no right to counsel to a defendant while undergoing a pretrial lineup, and principles associated with that right to counsel could not have been violated by defendant's participation in the lineup.

The question of the right to counsel at a pretrial lineup may only involve the right which is conferred by the sixth amendment or article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, § 8). Decisions of this court show, however, that this right to counsel has been consistently interpreted as arising only when adversary judicial proceedings have been initiated. (See *People v. Johnson* (1973), 55 Ill. 2d 62, 73; *People v. Reese* (1973), 54 Ill. 2d 51, 60.) A lineup which is held after the initiation of adversary judicial criminal proceedings without the presence of counsel for the accused is unconstitutional. Once it has been determined that a lineup violates this right to counsel, any evidence adduced by the prosecution that a witness identified the

defendant at the lineup is subject to a *per se* rule of exclusion. *People v. Curtis* (1986), 113 Ill. 2d 136, 143.

In this case, there is no question that adversary judicial proceedings had not been initiated at the time that defendant underwent the lineup. Defendant, then, was not entitled to the assistance of counsel at the lineup, and his right to counsel under section 8 could not have been violated.

Since defendant possessed no right to counsel at the lineup under either section 10 or 8, suppressing evidence of defendant's lineup identification could not have served to safeguard either of those rights. (*Cf. People v. Winsett* (1992), 153 Ill. 2d 335, 352 (*Miranda* exclusionary rule is judicially created device designed to safeguard defendant's constitutional rights by barring the use of statements taken in disregard of related constitutional principles).) The exclusionary sanction applied by the trial court here bore no relation to any violation of constitutional rights or principles under either section 8 or 10 and was insupportable on those bases.

Suppression of defendant's lineup identification here is also insupportable under section 2 (due process). Assuming that a violation of section 2 had been found, the exclusionary rule's limitations would apply. This court recognizes the "fruit of the poisonous tree" doctrine to apply where police violate a defendant's constitutional rights. The constitutional violation is termed the "poisonous tree" and any evidence which the State obtains by exploiting that constitutional violation is subject to suppression as the "fruit" of that poisonous tree. (See *Winsett*, 153 Ill. 2d at 351.) When police conduct results in a violation of constitutional rights, evidence obtained as a result of that violation, and only evidence so obtained, is to be suppressed. *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640.

Here, evidence of defendant's lineup identification could not be considered the "fruit" of the alleged violation of due process rights. The police conduct, assuming that it violated due process, does not result in defendant being subjected to the lineup identification. Defendant would have been required to participate in the lineup regardless of whether he had been allowed to consult with his attorney or was informed that his attorney was present. (See *Nelson*, 40 Ill. 2d at 152 (holding defendant does not have a right to refuse to submit to lineup).) Because the lineup identification was not the fruit of that alleged police misconduct, there could be no basis to suppress evidence of the lineup identification. We conclude that the trial court erred in suppressing defendant's lineup identification on this basis as well.

For the foregoing reasons, we would affirm the trial court's order suppressing any statements defendant made after his attorney was present at the station and refused access to him. We would reverse the trial court's order suppressing evidence of the lineup identification of defendant. The judgments of the appellate and circuit courts are therefore affirmed in part and reversed in part, and the cause is remanded to the circuit court for further proceedings.

*Appellate court affirmed in part*
*and reversed in part;*
*circuit court affirmed in part*
*and reversed in part;*
*cause remanded.*

CHIEF JUSTICE BILANDIC, concurring in part and dissenting in part:

In appropriate cases, this court certainly has the right and the obligation to construe provisions of our State constitution more liberally than similar provisions in the Federal Constitution. (*People v. Perry* (1982),

147 Ill. 2d 430, 436.) In the past, however, this court has repeatedly held that the right to counsel under article I, section 10, of the Illinois Constitution is measured by the same standards as are used in defining the right to counsel in the fifth amendment to the United States Constitution. (*People v. Perry* (1982), 147 Ill. 2d 430, 436; *People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, 160.) The majority makes an unwarranted and unsupported departure from this line of cases and holds that article I, section 10, affords defendants with more protection than the fifth amendment to the Federal Constitution (U.S. Const., amend. V). The majority cites this court's decisions in *People v. Smith* (1982), 93 Ill. 2d 179, *People v. Holland* (1987), 121 Ill. 2d 136, and *People v. Griggs* (1992), 152 Ill. 2d 1, as support for its conclusion. None of those cases, however, held that article I, section 10, affords defendants with more protection than the fifth amendment of the Federal Constitution.

The court in *Smith* suppressed the defendant's inculpatory statements because the police failed to inform the defendant that his attorney was present and seeking to consult with him. The court specifically stated, however, that it "rest[ed] [its] conclusion upon the defendant's right to counsel during custodial interrogation. *That right stems from the fifth amendment protection against self-incrimination.*" (Emphasis added.) (*Smith*, 93 Ill. 2d at 185.) *Smith* never cited or discussed the Illinois constitutional privilege against self-incrimination. Rather, the *Smith* decision was based solely upon a construction of the scope of the Federal Constitution, which the United States Supreme Court later declined to adopt.

In *People v. Holland* (1987), 121 Ill. 2d 136, this court was asked to reconsider the *Smith* decision in light of the Supreme Court's decision in *Burbine*. The defendant in *Holland* urged the court to reject the Supreme Court's

construction of the fifth amendment right to counsel in *Burbine* and to adopt the analysis in *Smith* as a matter of State constitutional law. The court declined to do so, concluding that the facts before it were identical to *Burbine* and distinguishable from *Smith*. Thus, contrary to the majority's suggestion, *Holland* did not "preserve[ ] the *Smith* rule as an appropriate interpretation of our State constitutional guarantees." (163 Ill. 2d at 438.) Rather, *Holland* accepted *Burbine* as the appropriate construction of the defendant's right to counsel under both the Federal and the Illinois Constitutions under the facts of that case.

*People v. Griggs* likewise did not hold that a defendant's right to counsel under the State constitution is broader than the right to counsel under the fifth amendment. Although the defendant in *Griggs* urged the court to reject *Burbine*, the court declined to do so. Rather, that court decided that "*Burbine* is not dispositive, as it is factually distinguishable." *Griggs*, 152 Ill. 2d at 25.

The majority concludes, however, that the grounds on which *Griggs* sought to distinguish *Burbine* were "conceptually meaningless as a statement of Federal law" (163 Ill. 2d at 435) and that "there is no tenable basis in Federal constitutional law for the *Griggs* decision" (163 Ill. 2d at 435). Even assuming *arguendo* that the majority is correct in concluding that *Griggs* improperly construed the scope of the fifth amendment or the *Burbine* decision, it does not necessarily follow that the *Griggs* decision was based upon or correctly interpreted article I, section 10, of the Illinois Constitution.

Having concluded that article I, section 10, affords defendants with the same protection as the fifth amendment to the Federal Constitution for so many years, we should not suddenly change course and go our separate

way simply because this court in *Griggs* may have improperly construed the scope of the *Burbine* decision. Any decision that our privilege against self-incrimination is broader than its Federal counterpart must be based upon more substantial grounds. We must find something in the language of our constitution or in the debates and committee reports of the constitutional convention that will suggest that the framers intended our constitutional privilege against self-incrimination to be broader than the fifth amendment privilege.

There is nothing in the text of our constitution that suggests that the State privilege against self-incrimination is broader than its Federal counterpart. Article I, section 10, of the Illinois Constitution provides that "[n]o person shall be compelled in a criminal case to give evidence against himself." (Ill. Const. 1970, art. I, § 10.) This language is almost identical to that in the fifth amendment to the Federal Constitution, which states that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) This court has held that "[t]he two provisions differ in semantics rather than in substance and have received the same general construction." *People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, 160.

There is likewise no evidence in the committee report to the constitutional convention or in the debates to suggest that the drafters of the 1970 Constitution intended article I, section 10, to afford broader protection than the fifth amendment. The majority claims that the records of the convention show that the delegates intended article I, section 10, to incorporate "then existing" principles derived from *Escobedo* and *Miranda*. (163 Ill. 2d at 439.) To support this claim, the majority cites language from a committee report and comments by Delegate Weisberg. When read in their

proper context, however, neither the committee report nor Weisberg's comments support the majority's conclusion.

Article I, section 10, was drafted by the Committee on the Bill of Rights. When Delegate Weisberg presented the Committee's proposal to the full convention, he explained that the Committee had decided to retain the same language in article I, section 10, as appeared in the self-incrimination clause of the 1870 Constitution. (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1379; see also Ill. Ann. Stat., Ill. Const. 1970, art. I, § 10, Constitutional Commentary, at 492 (Smith-Hurd 1971).) Weisberg reassured the convention, however, that the "existing state of the law would remain unchanged." This declaration did not refer to the *Miranda* and *Escobedo* decisions, as the majority suggests. Rather, Weisberg's statements indicate that the drafters did not intend to overrule those court decisions that had determined that the privilege against self-incrimination applied to noncriminal proceedings. (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1379; see also Ill. Ann. Stat., Ill. Const. 1970, art. I, § 10, Constitutional Commentary, at 492 (Smith-Hurd 1971).) Nothing in the debates or the committee report even remotely supports the majority's implication that the drafters of article I, section 10, considered and intended to incorporate those portions of the *Miranda* and *Escobedo* decisions cited in the majority opinion.

In fulfilling our obligation to interpret the scope of article I, section 10, we must carefully balance the legitimate aims of law enforcement against the defendant's right not to incriminate himself. (See *People v. Perry* (1992), 147 Ill. 2d 430, 436.) Of course, we are not bound to automatically follow United States Supreme Court decisions interpreting the scope of the fifth amendment to the Federal Constitution. We may choose to follow a

particular decision, however, when we believe that it achieves a fair balance between the relevant competing objectives. (See *People v. Smith* (1983), 95 Ill. 2d 412, 422.) I conclude that the approach that the Supreme Court adopted in *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, will achieve the appropriate balance between the relevant public and private interests at stake.

In *Burbine*, the Supreme Court held that the fifth amendment to the Federal Constitution does not require the suppression of a suspect's inculpatory statements simply because the police failed to tell the suspect of a lawyer's unilateral efforts to contact him. The defendant claimed that the failure of the police to inform him that an attorney had called tainted his "otherwise valid" waiver of his fifth amendment right to counsel, because the police deprived him of information crucial to his ability to waive his rights knowingly and intelligently. The Court rejected this claim, concluding that events occurring outside of a suspect's presence and entirely unknown to him have no bearing on the suspect's capacity to comprehend and knowingly relinquish a constitutional right. The Court stated:

> "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Burbine*, 475 U.S. at 422-23, 89 L. Ed. 2d at 422, 106 S. Ct. at 1141.

The Court in *Burbine* also refused to modify *Miranda* to incorporate a rule requiring the police to inform a suspect of an attorney's efforts to reach him. The Court noted that the purpose of the *Miranda* warnings is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of a suspect's fifth amendment rights. (*Bur-*

*bine,* 475 U.S. at 425, 89 L. Ed. 2d at 423, 106 S. Ct. at 1143.) The Court concluded that the rule proposed by the defendant would contribute little, if anything, to *Miranda's* goal of dispelling the compelling nature of custodial interrogation. *Burbine,* 475 U.S. at 425, 89 L. Ed. 2d at 423, 106 S. Ct. at 1143.

The Court also noted that, even if the rule added marginally to *Miranda's* goal of dispelling compulsion, several practical considerations counseled against its adoption. First, the proposed rule would undermine *Miranda's* central " 'virtue of informing police and prosecutors with specificity ... what they may do in conducting [a] custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible.' " (*Burbine,* 475 U.S. at 426, 89 L. Ed. 2d at 424, 106 S. Ct. at 1143, quoting *Fare v. Michael C.* (1979), 442 U.S. 707, 718, 61 L. Ed. 2d 197, 208, 99 S. Ct. 2560, 2568.) The *Burbine* Court concluded that the proposed rule would undermine the clarity of *Miranda's* application and would raise a myriad of legal questions, such as:

"To what extent should the police be held accountable for knowing that the accused has counsel? Is it enough that someone in the station house knows, or must the interrogating officer himself know of counsel's efforts to contact the suspect? Do counsel's efforts to talk to the suspect concerning one criminal investigation trigger the obligation to inform the defendant before interrogation may proceed on a wholly separate matter?" *Burbine,* 475 U.S. at 425, 89 L. Ed. 2d at 423-24, 106 S. Ct. at 1143.

The *Burbine* Court also concluded that the proposed rule would result in an inappropriate shift in the subtle balance that *Miranda* struck between society's legitimate law enforcement interests and the protection of an accused's privilege against self-incrimination. (*Burbine,* 475 U.S. at 426, 89 L. Ed. 2d at 424, 106 S. Ct. at 1143.) The Court in *Miranda* recognized that custodial interrogation is a legitimate and necessary means of obtaining

admissions of guilt. At the same time, the Court recognized that the compelling nature of custodial interrogation undermines a suspect's ability to invoke the privilege against self-incrimination. The *Miranda* decision reconciled these opposing concerns by holding that the police may question a suspect only if the suspect clearly understands that he can bring the interrogation to a halt or, short of that, call in an attorney to give advice and monitor the conduct of his interrogators. *Burbine*, 475 U.S. at 426-27, 89 L. Ed. 2d at 424, 106 S. Ct. at 1144.

The Court in *Burbine* concluded that a rule requiring the police to inform a suspect of an attorney's efforts to contact him would upset the delicate balance struck in *Miranda*. Such a rule was not necessary to dispel the compulsion inherent in custodial interrogation. Any benefit achieved by the rule, in terms of dispelling compulsion, would be offset by the substantial cost imposed upon society's legitimate interest in securing admissions of guilt. *Burbine*, 475 U.S. at 427, 89 L. Ed. 2d at 424-25, 106 S. Ct. at 1144.

I believe that the Supreme Court's analysis in *Burbine* adequately safeguards a suspect's privilege against self-incrimination. Accordingly, I would adopt that analysis and hold that the right to counsel under article I, section 10, of the Illinois Constitution is measured by the same standards as are used in defining the right to counsel contained in the fifth amendment of the United States Constitution. Applying that standard here, it is clear that the trial court erred in suppressing the statements the defendant made to the police. The police informed the defendant of his rights pursuant to *Miranda*. The defendant never asked for an attorney and did not choose to remain silent. The defendant does not contend that his statements were involuntary or coerced. Nor does he contend that he did not comprehend

the nature of his right to counsel or the potential consequences of waiving that right. Under the circumstances, the defendant made a voluntary, knowing and intelligent waiver of his right to counsel within the meaning of article I, section 10, of our constitution. The fact that an attorney was present at the station and wished to speak with the defendant has no relevance to the validity of the waiver.

I do not disagree with the principle that the police have an *ethical* obligation to inform a suspect that an attorney is present at the station, attempting to contact him. I simply disagree with the majority's conclusion that a suspect has a *constitutional right* to be so informed. Where a suspect has validly waived his right to counsel, that waiver should not become invalid simply because an attorney happens to arrive at the police station. The constitutional right to have counsel present during questioning belongs solely to the defendant and may not be invoked by his attorney.

For the reasons stated, I respectfully dissent from that portion of the majority opinion which affirms the suppression of the defendant's statements.

JUSTICES MILLER and HEIPLE join in this partial concurrence and partial dissent.

JUSTICE MILLER, also concurring in part and dissenting in part:

I agree with the majority that the lineup identification evidence was improperly suppressed, and I concur in the majority's resolution of that issue. I do not agree, however, that the defendant's own statements were taken from him in violation of either his Federal or his State constitutional rights, and accordingly I dissent from that portion of the majority opinion.

I dissented in *People v. Griggs* (1992), 152 Ill. 2d 1, and I continue to believe that *Moran v. Burbine* (1986),

475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, controls the resolution of the Federal constitutional issue involved in *Griggs* and in this case and should control the corresponding State constitutional claim as well. Moreover, for the reasons stated by Chief Justice Bilandic in his separate opinion, which I join, I do not believe that our State constitutional privilege against self-incrimination grants broader protections than its Federal analogue.

The reasons offered by the majority in support of today's holding are not persuasive. First, the majority labors mightily in an attempt to establish that earlier decisions of this court addressing the same question were based on State and not Federal constitutional guarantees. 163 Ill. 2d at 426-39 (discussing *Griggs*, 152 Ill. 2d 1, *People v. Holland* (1987), 121 Ill. 2d 136, *aff'd on other grounds* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803, and *People v. Smith* (1982), 93 Ill. 2d 179).

The problem with the majority's analysis, however, is that it fails to recognize that the principal opinions in those cases did not purport to rely on or apply the Illinois Constitution. Only in concurring opinions filed by Justice Clark in two of those cases is there found the contention that the Illinois Constitution requires that law enforcement officers inform custodial suspects of their attorneys' efforts to reach them. (See *Griggs*, 152 Ill. 2d at 33-35 (Clark, J., specially concurring); *Holland*, 121 Ill. 2d at 166-72 (Clark, C.J., specially concurring).) In the end, the majority's discussion demonstrates not that *Griggs*, *Holland*, and *Smith* are explicable as a matter of State constitutional law, but simply that they would now be sustainable only on those terms.

The majority next turns briefly to a consideration of the drafting of the self-incrimination privilege of the Illinois Constitution. (163 Ill. 2d at 439-40.) The majority argues that the framers of the 1970 Constitution

intended to incorporate in article I, section 10, then-existing Federal constitutional interpretations of the fifth amendment. The majority's analysis of this question is fundamentally flawed, however. None of the sources cited by the majority opinion demonstrate that the drafters of the State constitution intended to adopt the specific rule of law announced here. Rather, the cited materials show only that the framers were familiar with the general scope of the fifth amendment guarantee and did not want to draft a provision at variance with the broad outlines of existing Federal law. Thus, I do not believe that it is accurate to say that the constitutional drafters believed that article I, section 10, was incorporating the rule expressed in this case, or even that the drafters intended to freeze the meaning of that provision to whatever then stood as the prevailing interpretation of the fifth amendment.

Offering a third ground in support of today's holding, the majority opinion refers to the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), and, as an explication of that clause, to a series of Illinois statutes, since repealed, that have previously required police officers to allow suspects to consult with counsel. (163 Ill. 2d at 440-45.) The majority's discussion of due process, however, is at bottom nothing but a *Miranda* analysis viewed through a due process lens. In addition, the statutes cited by the majority fail to provide any support for the majority's claim that our State constitution's due process clause grants greater protections than are recognized under the fifth amendment or *Miranda* and its progeny. These are statutes, and repealed ones at that, not provisions of a constitution, and are of little, if any, assistance to the resolution of the constitutional question posed here.

The majority's analysis of article I, section 10, of the Illinois Constitution and of this court's prior decisions

in *Griggs*, *Holland*, and *Smith* is unpersuasive. I do not agree with the court's conclusion that the privilege against self-incrimination found in our State constitution provides, or was intended to provide, protections in these circumstances different from the ones afforded by the fifth amendment to the United States Constitution, or with the notion that this court's prior decisions have already made that determination. In this context, I would apply to article I, section 10, of the Illinois Constitution the same principles announced by the Supreme Court in *Burbine*.

JUSTICE HEIPLE joins in this partial concurrence and partial dissent.

JUSTICE HEIPLE, also concurring in part and dissenting in part:

I agree with the majority's decision that the lineup identification of the defendant should not have been suppressed. However, the majority opinion breaks new ground in the area of evidence suppression and extends yet further procedural protections to persons accused of crime. Here, the defendant was a suspected murderer. He was under arrest and at the police station. After being given the requisite warnings, including his right to remain silent and his right to be represented by counsel, he willingly waived those rights and proceeded to talk.

Meanwhile, and unknown to the defendant, his family had retained a lawyer to represent him. The lawyer went to the police station but his efforts to speak with the defendant were rebuffed. The defendant's statements were later suppressed on the ground that the defendant had not been informed that a lawyer was asking to speak with him. That suppression order was affirmed by the appellate court and is again affirmed by the majority opinion.

The majority rests its decision on article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I, § 10), which is virtually identical to its Federal counterpart (U.S. Const., amend. V). Thus, the first order of inquiry would seem to be to look at article I, section 10, of the Illinois Constitution. What does it say? It says in its entirety, "No person shall be compelled in a criminal case to give evidence against himself nor be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10.

I suggest that no reasonable person would ever take those words to mean that the defendant in the instant case has been compelled to give evidence against himself. Indeed, the majority itself does not quite do that. Rather, the majority reaches its decision by considering a body of State and Federal cases which interpret the meaning of the cited words in our State and Federal Constitutions. Having done that in this case, it is fair to say that the decisions up to now have ruled, in essence, that a person who has been denied a lawyer or who has been denied access to his retained lawyer cannot, under such circumstances, have his statements used against him. The statements are deemed involuntary. That is to say, they are deemed compelled.

What the instant case does is to take that line of authority one step further and decree that the denial of access to a lawyer who is both unknown to the defendant and unretained by the defendant has the same effect. However, the extension of that protection to this case is unwarranted. This extension is unwarranted because it is the defendant's awareness of the lawyer and his capacity as the defendant's lawyer that should be the dispositive factor. Here, the defendant was offered a lawyer by the police and waived that offer. He was offered the right to remain silent and waived that offer.

It would seem to be a commonsense conclusion that the right against self-incrimination is a defendant's to either claim or waive. It should not belong to any lawyer who happens to show up at the station house and claims to represent a defendant who did not hire him and who is unaware of his presence.

Accordingly, I respectfully dissent from that portion of the majority's opinion which affirms the suppression of the defendant's statements.